96 N.J. Super. 125 (1967)
232 A.2d 661
LAURA FERNANDEZ, INDIVIDUALLY AND AS GUARDIAN AD LITEM, ETC., PLAINTIFF-RESPONDENT,
v.
RUDOLF J. BARUCH AND JOSEPH JUDD, JR., DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued February 14, 1967.
Decided July 13, 1967.
*130 Before Judges CONFORD, FOLEY and LEONARD.
Mr. H. Curtis Meanor argued the cause for appellant Joseph Judd, Jr. (Messrs. Lamb, Blake, Hutchinson & Dunne, attorneys).
Mr. Nicholas English argued the cause for appellant Rudolf J. Baruch (Messrs. McCarter & English, attorneys, Mr. Merritt Lane, Jr., of counsel, Mr. Franklin M. Sachs, on the brief).
Mr. Leslie S. Kohn argued the cause for respondent.
The opinion of the court was delivered by LEONARD, J.A.D.
This is a wrongful death action wherein the widow Laura Fernandez (plaintiff herein) seeks recovery as administratrix ad prosequendum for the suicidal death of her husband Pedro Fernandez (decedent) which she alleges was due to the malpractice of defendant psychiatrists. Defendants Rudolf J. Baruch and Joseph Judd appeal from a judgment in the amount of $35,000 entered against them following a jury trial. No appeal is taken from the dismissals entered by the trial court in favor of third-party defendants Elizabeth General Hospital (hospital) and Harvey Halberstadter.
On May 25, 1962 decedent was arrested on three counts of assault and battery, as a result of an altercation in which he attacked a friend with a knife without apparent provocation. He also bit and attacked two bystanders who attempted to help subdue him. The police took decedent directly from the scene of the conflict to the hospital, where he remained until June 12, 1962, when he was discharged into the custody *131 of the police. The next day he was arraigned in municipal court, and then he was transferred to the Union County jail where, on June 16, 1962, he hanged himself in his cell by means of his elastic socks.
The gist of the cause of action asserted against defendants was their negligence in failing to take all steps necessary for decedent's commitment before his release to the police, or to warn the latter about his dangerous mental condition and need for medication.
Upon admission decedent was placed on the neuropsychiatric service of the hospital, in which unit defendants alternated as chief and assistant in charge. Because of a shortage of bed space he was put in the regular men's surgical ward with a number of other patients. Initially decedent had been given 100 milligrams (mg.) of a tranquilizing drug known by the trade name of thorazine (chloropromazine hydrochloride). Thereafter he was administered a small dosage (50 mg.) of this drug every four hours "as necessary," not to exceed 200 mg. at any one time. One evening when he appeared especially agitated he was given a 100 mg. dosage. The administration of this drug was discontinued on the date of decedent's discharge. During his stay in the hospital he was generally calm; he was permitted use of ordinary eating utensils and normal bathroom privileges; his bed was located near a window, and he was not restrained.
Shortly after decedent's admittance to the hospital defendants ascertained that during the preceding four months he had on numerous occasions complained to his wife of insomnia, of frequent headaches, and of disturbed reactions to loud noises. It was their opinion that decedent possessed "violent and homicidal tendencies." They concluded that his illness was deep-rooted and not easily curable, and that he required psychiatric treatment and therapy which was available at a state mental institution but which could not be provided by the limited staff and facilities of a general hospital such as Elizabeth. Defendants testified that the *132 hospital policy at the time was not to permit patients on the neuropsychiatric service to remain under its hospital care for longer than three to four weeks, not only because of an inability to provide adequate extended treatment, but also because of the bed space shortage.
Consequently defendants attempted to have plaintiff commit decedent to a state mental institution, pursuant to N.J.S.A. 30:4-27, discussed infra, and requested her to sign the necessary commitment papers. Both doctors testified that either directly or through intermediaries they informed plaintiff of the seriousness of decedent's mental illness and of their opinion that he should be confined to a mental institution. Several nurses testified that they requested plaintiff to sign commitment papers and she refused. Her reason was that she wanted decedent to stay in the hospital which was nearer to her home than the state hospital at Marlboro; thus it would be easier for her to visit him more often.
Dr. Judd testified that several days before decedent's discharge he told plaintiff directly that her husband could not stay in the hospital, but that he required treatment at a state hospital and that "she had to commit him because there was a [police] detainer on him and she knew it and there was nothing else for him to do except to go to jail if she didn't send him to a state hospital." He further testified that he told her to "take a few days to think it over," and he was "never contacted by her again."
Plaintiff testified that she never spoke to either defendant directly about the necessity for commitment and that no one informed her at the hospital that if she did not have her husband committed he would be taken to jail. On cross-examination, however, she did confirm a conversation with the head nurse in which she indicated to the nurse her willingness to sign the papers if it were no longer possible for her husband to remain at the hospital.
Plaintiff's brother testified that while accompanying her to the hospital to visit decedent several days before his discharge *133 one of the nurses brought to them the blank commitment forms for her to sign but plaintiff refused for the reason given above.
In addition, Dr. Baruch testified that when he became aware that plaintiff would not cooperate and sign the commitment papers he telephoned the police detective assigned to the case, Sergeant Krug, and told him of their frustrated efforts and asked him if he would help them by taking decedent back to police headquarters and "see to it that he would be committed from there." The officer told him: "We will see what we can do; we will take care of it * * *."
Sergeant Krug testified that he stopped at the hospital on June 10, 1962 and was informed by a nurse that the recommendation for commitment had been made by the doctors and that the papers were there awaiting plaintiff's signature. He subsequently visited plaintiff and urged her to have decedent committed to a state mental institution, but without success.
On the day decedent was discharged from the hospital and transferred to the custody of the police plaintiff and her brother went down to the jail to bring him his clothes. At that time the police captain on duty offered her a blank set of commitment papers and suggested that she sign them to avoid having her husband remain in jail. That night she attempted to call Dr. Baruch and a female intern who had been associated with the case, but she was unable to locate them at the time. Plaintiff and her brother consulted a friend and then attempted to contact an attorney to assist them, but she did not attempt to again communicate with defendants and she never signed the papers.
Defendants primarily contend that plaintiff did not prove malpractice on their part. They allege that plaintiff's witnesses testified to no acts or omissions on their part which constituted a deviation from the accepted standard of medical care. We discuss individually plaintiff's contentions of improper conduct.

*134 I
At the trial plaintiff asserted as one basis for her claim of negligence that defendants failed to act in conformity with the prevailing professional standards in the community in not having decedent committed to a mental institution before releasing him to the custody of the police, despite their knowledge of his dangerous mental condition. Plaintiff argued that despite her own refusal to sign the necessary papers, defendants should have taken other steps to insure commitment, pursuant to N.J.S.A. 30:4-27. Pertinent portions of that statute follow:
"A person alleged to be insane may be committed to and confined in any institution for the care and treatment of the insane in this State in an action brought by a person interested in the admission of the patient by reason of relationship or marriage, or by the person having the charge or care of such patient, or by the sheriff, or by the county prosecutor, or by the municipal or county director of welfare or person charged with the care and relief of the poor, or by any chief of police or police captain of any municipality in this State where such patient may be, or by the chief executive officer of any correctional institution, or of any public or private charitable institution or hospital in which the patient may be, or by the Commissioner of Institutions and Agencies." (Emphasis added)
Plaintiff's expert Dr. Samuel R. Kesselman voiced the opinion that defendants deviated from the accepted practice by not having decedent committed pursuant to this statute. When asked to describe the proper standard of care, he replied:
"Well, the accepted practice is that if a man is considered psychotic and considered committable on the part of the attending psychiatrist or physicians, there are three ways of committing him to the State Hospital. One, through the applicant signing the papers and if that is not procurable, then the Director or Administrator of the hospital should sign the applicant's section of the papers and if efforts in that area fail, then a police captain or a warden of the jail or penitentiary can assume the initiative."
Although he contended the suggested procedure was one employed by practicing psychiatrists, he could recall only *135 one specific instance from his many years of practice in which someone other than a family member had signed the necessary papers when the next of kin had been available to do so.
The trial judge charged the language of the statute. However, upon objection thereto by defendant Baruch, he advised the jury of the permissive word "may" contained therein.
Defendants now contend that the language of the statute is indeed permissive and not mandatory, and that the above quoted testimony does not set forth an acceptable standard of care, but merely enumerates alternative procedures which may be employed in obtaining commitment of an individual who was thought to be insane and dangerous to himself or others. Defendants' experts testified that they knew of no instance where psychiatrists either signed or obtained the signature to commitment papers when the patient's next of kin refused to sign them.
It is incumbent upon the treating physician to utilize only that degree of care, knowledge and skill ordinarily possessed and exercised in similar situations by the average member of the profession practicing in that field. Schueler v. Strelinger, 43 N.J. 330, 344 (1964). As the court stated therein:
"A physician must be allowed a wide range in the reasonable exercise of judgment. He is not guilty of malpractice so long as he employs such judgment, and that judgment does not represent a departure from the requirements of accepted medical practice, or does not result in failure to do something accepted medical practice obligates him to do, or in the doing of something which he should not do measured by the standard above stated." (at p. 345; emphasis added)
Here plaintiff's proof fell far short of establishing a standard of care that made mandatory that defendants either sign or have one of the other statutory designated individuals sign the commitment papers. Certainly the statute does not create a standard for medical practice but merely *136 procedures for commitment in an appropriate case. Dr. Kesselman's testimony amounted to no more than his personal belief as distinguished from a recognized standard practice of the profession. This evidence did not tend to establish a duty, much less a deviation therefrom. In spite of this, the jury was advised of the contents of the statute. Although the court called the jury's attention to the permissive features thereof, we are of the opinion that taking the entire charge as a whole on the issue of malpractice the jury might have found in it a basis for determining defendants to be guilty of negligence solely because they failed to sign or have someone else in authority sign the commitment papers. It must be kept in mind that there was uncontradicted testimony that defendants stood ready to certify to decedent's commitable condition if plaintiff would institute the action contemplated by the statutory provision cited.
We thus conclude that the submission of this particular issue was prejudicial to defendants. Since the verdict in favor of plaintiff may have been founded thereon, we reverse and remand to the trial court for a new trial.

II
Plaintiff also contended that since defendants were unsuccessful in having decedent committed to a state mental hospital, they were negligent in failing to keep him confined to the local hospital instead of turning him over to the police. This issue requires resolution in view of defendants' grievance over the refusal of the trial court to grant their motions for dismissal. Moreover, disposition thereof will be of aid to the trial court at the retrial of this case.
Decedent was not a voluntary patient; he was brought to Elizabeth General Hospital by the police department for observation and medical treatment. The police filed a detainer against him and at all times retained jurisdiction over him. There is no allegation by plaintiff that decedent received inadequate care while in the hospital. Further, it *137 is undisputed that this general hospital had not the facilities or the staff to provide decedent with the proper long-term treatment which was admittedly necessary, even by Dr. Kesselman's testimony. As previously indicated, defendants requested the police to see to decedent's commitment when plaintiff would not cooperate with them.
It is not questioned that defendants and the other hospital authorities were obligated to return the patient to police custody upon discharge. Decedent was not confined in the hospital as a result of legal proceedings or even by voluntary consent to restraint; thus, there was no legal obligation on defendants or the hospital to keep him there. See Hohmann v. Riverlawn Sanatorium, 103 N.J.L. 458, 459 (E. & A. 1927). There is a distinction between the duty owed to a patient by a general hospital and the duty owed by a hospital specializing in the treatment of mental disorders. See Annotation, 11 A.L.R.2d 751, 795 (1950). The latter has a greater obligation than the former. Mesedahl v. St. Luke's Hospital Ass'n, 194 Minn. 198, 259 N.W. 819 (Sup. Ct. 1935). Defendants' failure to keep the decedent at the hospital was not an act of "abandonment." Cf. Clark v. Wichman, 72 N.J. Super. 486, 492 (App. Div. 1962).
We conclude that under all of the circumstances herein defendants acted within the prescribed guidelines of professional care in returning decedent to the police instead of keeping him in the local hospital which lacked suitable facilities for the long-term care required for treatment of his illness. On the same evidence this issue should not be submitted to the jury at the retrial of this case.

III
We next consider defendants' contention that it was error to submit to the jury the issue of whether malpractice was shown by their failure to inform the police authorities upon decedent's discharge that although he was then calm, *138 he was suffering from a dangerous mental condition and had been previously administered tranquilizing medication (thorazine) which had been discontinued on the day of his discharge.
Dr. Kesselman testified that assuming commitment to a state institution was unavailable, and the patient "was remanded to police custody, the police authorities should have been amply notified and directed that he did represent a suicidal homicidal risk and if medication were prescribed they ought to have been notified so that could have been continued as a protective measure." Failure to do so, he asserted, was a breach of standard medical practice. He further testified that with the discontinuance of the thorazine the prior active symptomology would return. In his opinion the discontinuance of the medication removed a "restraining mechanism" and "there is an explosive feeling."
According to Dr. Kesselman:
"* * * whenever there is homicidal [sic] or an assault acted out upon others, there exists within the individual a drive to destroy himself. And if an individual is motivated by an impulse to hurt someone else and is frustrated in that area, that hostility or aggressiveness can easily be internalized upon himself and destroy himself."
He classified decedent as "homicidal-suicidal," and indicated that defendants should have been aware of decedent's potential suicidal propensities and should have warned the police thereof.
Dr. Baruch testified that thorazine was no longer required at that time because decedent had become "asymptomatic, did not show any signs of agitation or confusion and * * * did not offer any evidence of delusions or violence." Defendants and their experts concluded that the available indicia of decedent's mental condition at the time of his admission did not indicate reasonable probability that he possessed latent suicidal tendencies.
Defendants' expert Dr. J. Berkeley Gordon stated that the record revealed that decedent "did not appear to be depressed, *139 he did not appear to be particularly anxious. He was not suffering from any melancholia." In his opinion and in that of the other defense expert, Dr. Arthur T. Colley, persons afflicted with suicidal tendencies generally display profound depression, unlike the aggressive symptoms displayed by decedent. They concluded that decedent did not display suicidal tendencies upon discharge; the continuance of thorazine was not required, and therefore defendants were not obligated to notify the police of the medication given or the discontinuance thereof. Defendants also assert that the evidence discloses that the police authorities were amply notified of decedent's mental condition. Five policemen in three vehicles, an unusual number for the purpose, were sent to the hospital upon his discharge to bring decedent to police headquarters. We have heretofore discussed the efforts of the police captain on duty at the time of decedent's arrival to have the necessary commitment papers executed.
We are of the opinion that the questions whether plaintiff rather than defendants was correct as to the "homicidal-suicidal" diagnosis, and whether defendants should have advised the continuance of the drug thorazine and informed the police of the effects of its discontinuance, were properly submitted to the jury. The jury could properly have found under the proofs that decedent's freedom from symptoms of depression and disturbance at the time of his discharge was due to his having been under thorazine until that day, and that defendants should have realized that sudden discontinuance of the drug might within a few days reactivate the earlier psychotic state with potentialities of violence either against others or the decedent himself.

IV
Defendants urge as an additional ground for reversal the inadequacy of proof of proximate causation, and the failure of the trial court to sufficiently explain to the jury the concept of intervening cause.
*140 In the court's charge, it noted the necessity of proof that there be "an established causal connection in the evidence relied upon between the alleged act of negligence and the death resulting." It properly defined proximate cause as being "any cause which in the natural and continuous sequence, unbroken by an efficient intervening cause, produces the result complained of and without which the result would not have occurred." A timely objection was made by defense counsel at the conclusion of the charge to the effect that the court failed to explain the meaning of the term "efficient intervening cause."
The issue of causation was important and, indeed, vital in the factual setting of this case. Barr v. Francks, 70 N.J. Super. 565, 570 (App. Div. 1961). There were serious questions raised by the proofs as to whether certain factors over which defendants had no control and could not anticipate might have intervened in the chain of causation to such degree as to relieve them from liability.
Although we do not deem the charge in this respect to constitute reversible error, nevertheless the court at the new trial should fully define and explain the term "intervening cause" and its relation to the issue of proximate cause under the pertinent facts. See, e.g., Rappaport v. Nichols, 31 N.J. 188, 203 (1959); Hellstern v. Smelowitz, 17 N.J. Super. 366, 373 (App. Div. 1952); Kreis v. Owens, 38 N.J. Super. 148, 155 (App. Div. 1955). We do not agree with defendants' contention that the facts could not have justified a jury finding or proximate cause under a correct charge on the point. The suicide here occurred after discharge, at a time when, according to the proofs, the effects of the last thorazine administered to decedent would just about have worn off. Cf. Rappaport, supra.

V
Defendants allege that it was error to submit the hypothetical question to plaintiff's expert, but we find that *141 the question embraced material facts supported by evidence in the case, and although not worded in the clearest manner, it was not so inaccurate as to require reversal. Fink v. City of Paterson, 44 N.J. Super. 129, 135 (App. Div. 1957). At the retrial care should be exercised to prevent submission of an opinion on any fact not adduced in evidence.

VI
Defendants also contend that the trial court erred in refusing to charge that plaintiff's own contributory negligence should preclude her recovery. We deem this contention to be without merit. New Jersey adheres to the view that contributory negligence on the part of the surviving next of kin of a decedent will not defeat an action under the Wrongful Death Act, N.J.S. 2A:31-1 et seq. Cloyes v. Delaware Tp., 41 N.J. Super. 27, 37 (App. Div. 1956), affirmed 23 N.J. 324 (1957).

VII
We find none of the remainder of defendants' points justify reversal, considered alone. However, we note our condemnation of the remark of plaintiff's counsel in summation which implied that defendants might have employed a different course of care and treatment than otherwise because decedent was a "non-paying patient." This remark was obviously improper and should not be repeated.
For the reasons stated in Point I of this opinion, the judgment is reversed and remanded to the trial court for a new trial.