Paul C. EDWARDS,
Plaintiff-Appellant,

v.

UNITED STATES of America,
Defendant-Appellee.

No. 74–2922.

United States Court of Appeals,
Fifth Circuit.

Sept. 17, 1975.

Rehearing Denied Jan. 20, 1976.

Jack B. Sellers, Allen B. Mitchell, Sapulpa, Okl., William H. Kugle, Jr., Athens, Tex., Joe A. Moore, School of Law, Memphis State U., Memphis, Tenn., for plaintiff-appellant.

Roby Hadden, U. S. Atty., C. Houston Abel, Asst. U. S. Atty., Tyler, Tex., for defendant-appellee.

Before BROWN, Chief Judge, and WISDOM and COLEMAN, Circuit Judges.

PER CURIAM:

Paul C. Edwards seeks in this action under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–80 (1970), to recover damages from the United States for injuries allegedly received as a result of negligent medical treatment while an inmate of the Federal Correctional Institute at Texarkana, Texas (F.C.I.). Edwards, then fifty-five, entered prison an active man, though afflicted with diabetes mellitus, angina pectoris, exogenous obesity, and labile hypertension. Fourteen months later, he had a stroke that left him partially paralyzed on his left side. After his release from prison, he filed this suit, alleging that the negligent failure of the treating physicians at F.C.I. to control his diabetes had been a proximate cause of his stroke. The district court, after a full trial, found the evidence insufficient to establish either causation or negligence and dismissed the case with prejudice. We affirm.

Edwards has been diabetic since at least 1946. For the seven years before his imprisonment, he had been under the care of his personal physician, Dr. Richard Liebendorfer, a board eligible internist. In treating Edwards, Dr. Liebendorfer had relied on insulin and dietary control. Edwards' wife had cooperated closely with Dr. Liebendorfer. She prepared properly balanced diabetic meals and varied insulin dosages to meet demands created by her husband's dietary indiscretions, changes in levels of activity, stress, and other factors affecting his urine sugars. Dr. Liebendorfer had maintained Edwards on 50 to 80 units of insulin per day.

When Edwards arrived at F.C.I. he was taking 50 units of insulin daily. The Chief Medical Officer, after interviewing him, taking his medical history, and evaluating test results, reduced this insulin dosage to 35 units a day, though he later increased it to 40 units.[1] He and his successor maintained the dosage at that level throughout Edwards' imprisonment, except for the period immediately following the stroke when dosages were increased to as much as 80 units daily. Otherwise, there were no variations in the daily dosages. When Edwards first arrived, the Chief Medical Officer discussed with him dietary principles with which, as a long-time diabetic, Edwards was familiar. Edwards' urine sugars were checked four times daily. When high readings resulted, a test for acetone was run. The doctors ordered blood tests at regular intervals during the first eight months of Edwards' imprisonment. During the six months preceding the stroke, however, they ran no blood tests. In January 1969, Edwards had a stroke which, the experts agreed, bore all the earmarks of

---

1. On November 28, 1967, Dr. Liebendorfer wrote inquiring about the status of Edwards and stating, "I am curious to know whether or not you were able to get him off insulin and maintain normal blood sugars. I have felt the regularity of eating habits if a more strict diabetic control was carried out would be of great benefit to his diabetic status."

a thrombosis. Edwards was left partially paralyzed on his left side, impotent, and unable to earn a living in his former occupation as a used-car salesman. He was released from prison in April 1969.

State law controls the issue of liability under the Act. *United States v. Muniz,* 1963, 374 U.S. 150, 162–163, 83 S.Ct. 1850, 10 L.Ed.2d 805; *Richards v. United States,* 1962, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492. Texas law, therefore, would determine if expert testimony is necessary to establish the negligence of a physician. *Rewis v. United States,* 5 Cir. 1966, 369 F.2d 595; *Watson v. United States,* 5 Cir. 1965, 346 F.2d 52, *cert. denied,* 382 U.S. 976, 86 S.Ct. 544, 15 L.Ed.2d 467. Applied to this case, Texas law imposes on the treating physicians a duty to exercise that degree of care which a general practitioner of ordinary prudence and skill, practicing in the Texarkana community or a similar community would have exercised in the same or similar circumstances. See, e. g., *Bowles v. Bourdon,* 1949, 148 Tex. 1, 219 S.W.2d 779; *Bender v. Dingwerth,* 5 Cir. 1970, 425 F.2d 378, 384; 45 Tex.Jur.2d § 131. Texas cases are in agreement that a plaintiff, to recover for injuries suffered from medical negligence, must show, by expert testimony, that the treating physicians breached the standard of care.[2] *Hart v. Van Zandt,* Tex. 1966, 399 S.W.2d 791; *Bowles v. Bour-*

don. The record supports the district court's finding that Edwards failed to bear that burden.

Edwards complains of a number of specific acts and omissions allegedly amounting to negligence: the reduction of his insulin dosage to 40 units daily; the failure to provide him with a diet adequate to his special needs; the refusal to transfer him to a medical facility equipped to handle his problems; and the failure of the young practitioners[3] who treated him to call in a specialist in internal medicine to monitor Edwards' health.[4]

We pass the question of the causal connection between these alleged failures and the stroke. The most salient defect in Edwards' case was the failure to establish by expert testimony that any of these acts amounted to negligence. Dr. Liebendorfer, Edwards' only expert witness, did not express the opinion that Edwards had received improper medical care, nor did he testify as to a standard of care, a predicate on which the court might have based a finding of negligence.

Dr. Liebendorfer testified that many prominent specialists believed that frequent injections of varying doses, correlated to urine sugar levels, was preferable to the single daily dose administered at F.C.I. He offered this, as the district

---

**2.** In *Bowles v. Bourdon,* the Texas Supreme Court said:

"It is definitely settled with us that a patient has no cause of action against his doctor for malpractice, either in diagnosis or recognized treatment unless he proves by a doctor of the same school of practice as the defendant: (1) that the diagnosis of treatment complained of was such as to constitute negligence and (2) that it was a proximate cause of the patient's injuries."

219 S.W.2d 779.

**3.** The first doctor to treat Edwards at F.C.I. was graduated by Columbia University with an A.B. degree in 1961 and by the State University in New York, Downstate Medical Center College of Medicine, in Brooklyn, New York in 1965. The Public Health Service assigned him to F.C.I. after completion of his internship at the University of Pittsburgh

Health Center Hospitals. His successor was graduated with a B.S. degree from the University of Texas in 1962 and the St. Louis Medical School in 1967. He was assigned to F.C.I. after his internship at Methodist Hospital in Houston, Texas. Both are now board certified internists.

**4.** Edwards also presses the contention that the failure to take his blood pressure for six months prior to his stroke constituted negligence on the part of the Chief Medical Officer. The record, however, suggests no causal connection between this omission and Edwards' stroke, which the experts agreed had all the appearances of a thrombosis. Tests administered after the stroke revealed no evidence of a hemorrhage. Similarly, there is nothing to suggest that the refusal to permit him to take certain medications prescribed by Dr. Liebendorfer was a cause of the stroke.

court pointed out, not as a standard of medical care but as a working medical hypothesis. He conceded that there were other medically acceptable approaches. He did not criticize the decision to reduce the insulin Edwards received, nor did he indicate how the level of insulin administered should be determined. He did not indicate that the readings turned up by Edwards' urine tests should have alerted the doctors that his diabetes was not in control.[5] In fact, he did not indicate why he thought the diabetes had not been in control. He did not testify that a diabetic, exercising judgment and restraint, could not obtain a generally adequate diet in the prison cafeteria, although after an examination of typical ten-day menu, he concluded it "might be spotty".[6] He conceded he had no first hand knowledge of the food served there. He also expressed some doubt about the average diabetic inmate's ability to avoid some of the items offered that are proscribed for diabetics. He did testify that he believed Edwards should have seen a consulting specialist in internal medicine once a month. He conceded at the same time that general practitioners regularly treated similar patients without the aid of specialists.

Dr. Jack Smith testified for the United States. Dr. Smith is a diplomate of the American Board of Internal Medicine, an internist in a nineteen-doctor clinic in Texarkana, and a member of the faculty of the Louisiana State University School of Medicine, Shreveport, Louisiana. He testified that the food served at F.C.I. was comparable to a commercial cafeteria; that the exchange method of diet control was available to appellant nine out of ten days on the ten-day menu sample; that all the elements of a proper diabetic diet were there; that Edwards, following instructions, could have eaten food at F.C.I. consistent with a diabetic diet except on one day when he could not get an adequate fruit exchange. He said that the treatment of Edwards at F.C.I. was consistent with the standard of treatment in the community; that [the] decision to reduce Edwards' insulin from 50 units to 35 units and three months later to 40 units was medically acceptable. Dr. Smith summarized his testimony as follows:

"On a scale of ideal, fair, satisfactory and unsatisfactory, I would classify Mr. Edwards as fair. His control was fair. He was free of symptoms. His blood sugar was low enough that his 6:00 a. m. sugars were usually "trace" to negative. His sugars taken after meals usually showed the presence of a large amount of sugar, which is more or less to be expected. . . . There's a physiological reason for trying to keep patients on 35 to 40 units of insulin. The normal human body makes 40 units of insulin a day. This is physiologic. . . . I think [his F.C.I. doctors'] assessment and his medication was proper, so that's about all I have. I think that sums it up."

Dr. Liebendorfer went so far as to say that he believed the F.C.I. physicians had committed a mistake in judgment. This alone is not enough to establish liability. *Hart v. Van Zandt; Bowles v. Bourdon.* Expert testimony must estab-

---

**5.** Tests run after meals often registered high readings. Early morning tests were always negative or showed only a trace of sugar. A government expert, Dr. Jack C. Smith, testified that higher urine sugar readings after meals were normal and to be expected. Dr. Liebendorfer said nothing to contradict this statement.

Dr. Liebendorfer, in response to questions put to him by the court, did testify that it was recommended that blood sugar tests be run about once every two months in the case of a patient whose diabetes is not easily controlled.

He did not indicate a conviction that Edwards' blood should have been checked that often. Indeed, he testified that in Edwards' case, there was a very high correlation between blood sugars and urine sugars. One of the F.C.I. doctors cited this correlation as one of the reasons for taking fewer blood tests.

**6.** Examining the whole menu, Dr. Liebendorfer pointed to two meals that he said were inadequate for a diabetic. Dr. Smith, examining the same menu, found one breakfast inadequate because it failed to offer an adequate "fruit exchange".

lish a professional standard of care and a deviation from that standard. On this record we need not consider the Edwards' contention that the district court read Texas law too narrowly in holding that the plaintiff had the burden of showing a deviation from the *local* standard of care; that the "community" involved is the federal penal system and the standards of care to be adhered to must be measured against those of the national community. We find nothing in Dr. Liebendorfer's testimony or in the testimony of the government's experts to establish a deviation from *any* professional standard of care.

The judgment of the district court is affirmed.

JOHN R. BROWN, Chief Judge (dissenting):

While the opinion of this Court cannot cure the grievous physical infirmities of the plaintiff, I regret that we do not take this opportunity to remedy the troi-

ka of legal infirmities suffered by the trial court's opinion.

## Infirmity No. 1

### The Necrosis Of The Locality Rule In Texas

The trial court apparently attempted to resurrect the dying doctrine that a doctor's negligence must be established by the testimony of a doctor familiar with the community of treatment standards of medical practice.[1] I believe that such strict adherence by the trial court to what has been termed the Locality Rule cannot be squared with developing Texas precedent[2] as well as that of other jurisdictions.[3] Surely modern medical technology, standardized medical education and practice and modern communication facilities dictate the abandonment of a rule which was initially developed to vary the standards of care according to the expertise and training of practitioners in cities as opposed to those in the rural setting.[4]

1. The memorandum opinion of the trial court entered April 22, 1974 provides in pertinent part:

    "Dr. Liebendorfer twice stated that he had never been in Texarkana, Texas; that he had no idea what the medical standards of that community were; and that he knew no doctors [sic] who practived [sic] in Texarkana * * * In addition, the United States called two medical experts who were familiar with medical practices in the Texarkana community. Both stated that there was nothing about Dr. Hotchkiss' treatment of the plaintiff that they considered inadequate by community medical standards.

    The court has considered the plaintiff's arguments that the requirement of expert testimony relating to local medical standards is archaic and arbitrary, and that it should not preclude the plaintiff's recovery in a case such as this one, in which the record contains some evidence of mistreatment and neglect. While this court regards the plaintiff's contentions to be forceful and persuasive, nevertheless it cannot justify a departure from the principles of Texas law regarding medical malpractice. *See* Appendix at 38–39.

2. *See generally,* Perdue, *The Law of Texas Medical Malpractice,* 11 Houst.L.Rev. 1, 36–38 (1973).

3. Several other jurisdictions have abandoned the Locality Rule and adopted a rule whereby

the standard of care required of a doctor is that of an average practitioner under the same or similar circumstances and the locality in which the practices is merely a factor to be considered in determining proper care and skill under the circumstances. *See, e. g., Brune v. Belinkoff,* 1968, 354 Mass. 102, 235 N.E.2d 793, 798; *Fernandez v. Baruch,* 1967, 96 N.J.Super. 125, 232 A.2d 661, at 666; *Douglas v. Bussabarger,* 1968, 73 Wash.2d 476, 438 P.2d 829, 837–38. *See also Pederson v. Dumouchel,* 1967, 72 Wash.2d 73, 431 P.2d 973 (held reversible error to limit the standard of care solely to that of the same or similar community); *Hundley v. Martinez,* 1967, 151 W.Va. 977, 158 S.E.2d 159 (Court allowed a New York specialist to testify as to standard of care in a suit tried in West Virginia against a physician with the same special training); *Blair v. Eblen,* Ky., 1970, 461 S.W.2d 370 (where the Court called for the adoption of a national standard of care). *See generally* Waltz, *The Rise and Gradual Fall of the Locality Rule in Medical Malpractice Litigation,* 18 DePaul L.Rev. 408, 418 (1969); Note, *Locality Rule in Malpractice Suits,* 5 Calif.W.L.Rev. 124, 128–31 (1969); Note, *Malpractice and Medical Testimony,* 77 Harv.L.Rev. 333, 338 (1963); Note, *An Evaluation of Changes in the Medical Standard of Care,* 23 Vand.L.Rev. 729, 737–38 (1970).

4. *See* Perdue, *The Law of Texas Medical Malpractice, supra* at 36.

In Texas it was long ago established that a doctor need not live and work in a community to qualify as an expert witness [5] and in *Hart v. Van Zandt*, Tex., 1965, 399 S.W.2d 791, a neurosurgeon practicing in Pennsylvania was deemed to be a member of the same school of practice as a Texas physician and accordingly was allowed to testify as to the standard of care which the latter should have exercised in the treatment of a patient in Texas.

Particularly with a disease such as diabetes where doctors uniformly agree, as they did in the trial court,[6] that the treatment is a combination of insulin injections and dietary control a doctor experienced in the treatment of this disease would be qualified to testify as to the standard of care to be exercised by physicians treating the disease and in the Eyes of Texas the locality of the witnesses' own practice or localizing the standard to the community of treatment would not be decisive.

### Infirmity No. 2

*The Burden Of Proof Is Overweight*

Another pointed inadequacy of the trial court's opinion [7] and that of the majority of this Court [8] is that the plaintiff was required to show by expert testimony that the prison doctors were *negligent.*

Substantial Texas authority [9] supports the proposition that what constitutes negligence is a mixed question of law and fact and the resolution of this ultimate issue is within the exclusive province of the trier of fact. Accordingly, it is quite improper to require the plaintiff to bear the extraordinary burden of bringing forward expert testimony stated in conclusory terms of negligence or its equivalent to establish negligence (or proximate cause).[10]

5. *Turner v. Stoker*, Tex.Civ.App., 1926, writ ref'd, 289 S.W. 190, 194.

6. The District Court recognized in its memorandum opinion that all the doctors who testified believed that dietary control was an integral part of the treatment of diabetes. *See* App. at 34.

7. The trial court states in its memorandum opinion that:

It is further required that the opinion evidence offered by the plaintiff be to the effect that the physician whose conduct is the subject of inquiry was negligent according to the standards of the community in which he was practicing. *Cleveland v. Edwards*, 494 S.W.2d 578 (Tex. Civ.App.—Houston [14th Dist.] 1973).
*See* App. at 37.
The Court further aborated its belief that the expert witness must state that the doctor's conduct was negligent by saying:
Although Dr. Liebendorfer testified that he would have procured the services of a dietician had he been the medical authority at FCI, *he did not give the opinion that the failure to do so was negligent or inadequate according to medical standards.* (Emphasis added).
*Id.*

8. This Court states unequivocally:
The most salient defect in Edwards' case was the failure to establish by expert testimony that any of these acts amounted to negligence.
P. 1139.

9. The leading case is *Snow v. Bond*, Tex., 1969, 438 S.W.2d 549, 550–51 which states in pertinent part:
"What constitutes negligence or malpractice is a mixed question of law and fact that can only be determined by the trier of fact on the basis of evidence admitted and instructions given by the court. A medical expert is not competent to express an opinion thereon. See *Houston & T. C. R. Co. v. Roberts*, 101 Tex. 418, 108 S.W. 808. The question of what a reasonable and prudent doctor would have done under the same or similar circumstances must also be determined by the trier of fact after being advised concerning the medical standards of practice and treatment in the particular case. An expert witness can and should give information about these standards without summarizing, qualifying or embellishing his evidence with expressions of opinion as to the conduct that might be expected of a hypothetical doctor similarly situated. The latter is not an appropriate subject for expert testimony. See *Phoenix Assur. Co. of London v. Stobaugh*, 127 Tex. 308, 94 S.W.2d 428."
*See also Sanchez v. Wade*, Tex.Civ.App.—El Paso, no writ, 1974, 514 S.W.2d 812, 815; *Prestegord v. Glenn*, Tex.Civ.App.—Amarillo, 1970, 451 S.W.2d 791, *reversed on other grounds*, Tex., 456 S.W.2d 901; *cf. Bender v. Dingwerth*, 5 Cir., 1970, 425 F.2d 378, 385.

10. The Texas Supreme Court has held that while expert testimony as to the "possibility"

This basic error then leads the Court to conclude that there is no evidence of "negligence".[11] Of course while it is true that the plaintiff's expert never in so many words testified that the prison doctor's conduct was negligent or violated a standard of care, but in the Eyes of Texas the weight to be given medical testimony should be determined by the substance of the testimony of the expert witness and does not turn on semantics or on the use by the witness of any particular conclusory term or phrase.[12] Upon a close examination of the substance of Dr. Liebendorfer's[13] testimony, it is evident that the prison doctors were to some degree negligent[14] and that their negligence was a contributing cause[15] of the plaintiff's stroke.

Thus, the majority's broad statement that the plaintiff failed to establish a deviation from *any* professional standard of care[16] is both overstatement and approval of a fact-legal conclusion under the overpowering influence of an incorrect legal standard. It provides an inadequate basis for the majority's out of hand rejection of the plaintiff's case.

### Infirmity No. 3

### *This Is Not Malpractice But A Gaoler's Case*

Probably the most fundamental malady suffered by the trial court's opinion is that it treated this case as if it were a malpractice suit rather than judging the propriety of the plaintiff's claim in light of the duty imposed by statute upon the Bureau of Prisons under the direction of the Attorney General of the United States to exercise ordinary care[17] to provide for the health and welfare of federal prisoners.[18]

of medical negligence or causation is not determinative of negligence, it is admissible and probative of the issue. *Bowles v. Bourdon*, 1949, 148 Tex. 1, 219 S.W.2d 779; *see also* Musselwhite, *Medical Causation Testimony in Texas: Possibility v. Probability*, 23 Sw.L.J. 622, 624.

11. P. 1141.

12. *Insurance Company of North America v. Myers*, Tex., 1966, 411 S.W.2d 710.

13. Dr. Liebendorfer not only fills the shoes of an expert witness, but also has additional knowledge of the plaintiff's individual physical problems because he successfully treated him for a number of years before he was incarcerated.

14. The plaintiff's expert witness, Dr. Liebendorfer, made several statements which indicated that the prison doctors negligently treated plaintiff's diabetic condition. *See, e. g.*, R.Vol. III at 74 (that the combination of diet, insulin injections and the administering of other drugs to control the other maladies of the plaintiff had resulted in successful treatment prior to his incarceration); R.Vol. III at 91 (prison officials should have provided a special diet for inmates with need for dietary control); R.Vol. III at 99 (the prison doctors should have checked plaintiff's blood pressure more often); R.Vol. III at 86, 126 (prison doctors should have kept plaintiff on a controlled regimen of insulin dosages and dietary control and the failure to do so in the witnesses estimation was a contributing factor to the plaintiff's stroke).

15. There is also ample expert medical testimony of causation. *See, e. g.*, R.Vol. III at 68–69 (causal connection between diabetes and circulatory ailments and more particularly stroke); R.Vol. III at 86 (failure to control plaintiff's insulin dosages and diet was a contributing cause of the stroke); R.Vol. III at 126 (expert states that if plaintiff had been kept on the controlled regimen, as to diet and drug dosages, which he lived under prior to his incarceration he probably would not have had his stroke).

16. P. 1141.

17. *Bourgeois v. United States*, N.D.Tex., 1974, 375 F.Supp. 133; *Brown v. United States*, E.D. Ark., 1972, 342 F.Supp. 987; *Cohen v. United States*, N.D.Ga., 252 F.Supp. 679, *reversed on other grounds*, 5 Cir., 389 F.2d 689.

18. 18 U.S.C.A. § 4042 requires:
§ 4042. *Duties of Bureau of Prisons*
The Bureau of Prisons, under the direction of the Attorney General, shall—
(1) have charge of the management and regulation of all Federal penal and correctional institutions;
(2) provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States, or held as witnesses or otherwise;
(3) provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States;

In the case at hand the parties stipulated that the government had notice of the plaintiff's physical infirmities [19] before he was incarcerated. Nevertheless, the prison officials following routine practice confiscated from the plaintiff upon his arrival at the prison all of the medications which he took to aid him in coping with his various physical problems except for his nitroglycerin.[20] The doctors in this case agree that proper treatment of diabetes includes both dietary control and insulin injections. Yet, the testimony of Dr. Liebendorfer and Dr. Cyprus indicates that the prison diet was inadequate for a diabetic's needs[21] and. Dr. Hotchkiss stated that the plaintiff had a hard time adhering to a proper dietary regimen.[22] Nevertheless, prison doctors refused to recommend the establishment of a special cafeteria line for diabetics.[23] While I recognize that proper dietary control may allow a physician to reduce insulin dosages, it seems inappropriate for Dr. Hotchkiss to reduce the plaintiff's dosage from 50 units to 35 units per day[24] in view of the prison's recalcitrance in providing dietary control.

We would not hesitate to impose liability upon the government if a prisoner sustained injury because he was required to live in conditions not fit for human habitation and in the same way we should not allow the federal prison system to force a prisoner to live under conditions which are repugnant to his individual physical needs. Similarly, it has been held in this Circuit[25] that state prisons have the duty to provide adequate medical care and failure to do so gives rise to a cause of action with due process underpinnings under 42 U.S.C.A. § 1983. I believe that the liability of federal prisons should be judged by the same standards under the Federal Tort Claims Act.[26]

In *Logue v. United States*, 1973, 412 U.S. 521, 532–33, 93 S.Ct. 2215, 2222, 37 L.Ed.2d 121, 131, the Supreme Court clearly recognized that liability under the Federal Tort Claims Act could arise if a federal official knew or should have known of a prisoner's infirmity and yet failed to take action to prevent injury to the prisoner. Upon the same rationale, the prison officials could be held to have violated their duty of safe keeping by failing to adequately attend to the plaintiff's medical needs after having been apprised of his various physical infirmities.

One could argue that liability under the Tort Claims Act is improper in the prison setting because the Act is designed to impose liability on the government as if it were a private individual and individuals do not operate prisons. But to those doubting souls I must once

---

(4) provide technical assistance to State and local government in the improvement of their correctional systems.

This section shall not apply to military or naval penal or correctional institutions or the persons confined therein.

**19.** *See* R.Vol. I at 65. *See also* letters set out in the appendix at 417–24.

**20.** *See* R.Vol. I at 66. At the time of his incarceration the plaintiff was taking marplan, a drug which was used in conjunction with nitroglycerin to treat his heart condition. R.Vol. III at 74. In addition, he was taking a drug called Rauwiloid for his high blood pressure as well as Librium and Phenobarbital which were relaxants. *Id.* Dr. Liebendorfer testified that these drugs were necessary for the continued maintenance of plaintiff's health. *See* R.Vol. III at 100–01.

**21.** For medical testimony to the effect that the prison diet was inadequate for a diabetic, see R.Vol. III at 86, 91, 99, 126, 301.

**22.** R.Vol. II at 96.

**23.** R.Vol. II at 98.

**24.** R.Vol. II at 29–30.

**25.** *See, e. g., Newman v. Alabama*, 5 Cir., 1974, 503 F.2d 1320 (pending en banc on Eleventh Amendment issue) (class action by inmates in state prison challenging the uniform practices of neglectful medical treatment by prison officials); *Gates v. Collier*, 5 Cir., 1974, 501 F.2d 1291 (pending en banc on Eleventh Amendment issue) (conditions which deprived inmates of basic elements of hygiene and adequate medical treatment held constitutionally impermissible).

**26.** Particularly, 18 U.S.C.A. § 4042.

against stress, as I did in my dissenting opinion in *Logue v. United States*, 5 Cir., 1972, 463 F.2d 1340, 1341–42, *vacated and remanded*, 1973, 412 U.S. 521, 93 S.Ct. 2215, 37 L.Ed.2d 121 (on petition for rehearing en banc), that "[o]nce the Government undertakes performance of an act entailing a duty of ordinary care it may not thereafter avoid liability under the Federal Tort Claims Act simply by abandoning the undertaking and attempting to attribute the responsibility to someone else." *Indian Towing Company v. United States*, 1955, 350 U.S. 61, 69, 76 S.Ct. 122, 126, 100 L.Ed. 48, 56; *United States v. Gavagan*, 5 Cir., 1960, 280 F.2d 319, *cert. denied*, 1961, 364 U.S. 933, 81 S.Ct. 379, 5 L.Ed.2d 365.

Another reason why it is absurd to measure the duty of the Federal Government to provide medical care to prisoners by standards of medical malpractice is that the degree of care which the government must exercise varies according to the locality of the prison. Indeed, a uniform standard would be more appropriate for prison physicians whose only nexus with the medical standards of the locality is that the prison to which they are assigned happens to be geographically situated there.

For any one or all of these three reasons the action of the trial court ought not to be accepted and this Court ought to declare these principals and remand the case for a consideration of the facts in light of the correct legal standards rather than artificially characterizing this case as a malpractice suit between a private citizen and a freely selected physician.