719 A.2d 707

GATTO DESIGN & DEVELOPMENT CORP., A NEW JERSEY COR-
PORATION, PLAINTIFF–APPELLANT, v. THE TOWNSHIP OF
COLTS NECK, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued September 23, 1998—Decided November 10, 1998.

Before Judges HAVEY, SKILLMAN and PAUL G. LEVY.

*Peter S. Wersinger, III*, argued the cause for appellant (*Heffernan & Wersinger*, attorneys; *Mr. Wersinger*, on the brief).

*Roger McLaughlin*, argued the cause for respondent (*McLaughlin, Bennett, Gelson & Cramer*, attorneys; *Paul N. D'Apolito*, of counsel and on the brief).

The opinion of the court was delivered by

HAVEY, P.J.A.D.

In this zoning case, plaintiff Gatto Design & Development Corp., appeals from a grant of summary judgment in favor of defendant Township of Colts Neck upholding the validity of § 412 of the Colts Neck Township Development Regulation Ordinance (DRO). Plaintiff contends that § 412 of the DRO violates the Municipal Land Use Law (MLUL), *N.J.S.A.* 40:55D-6 and 53, because it: (1) precludes a developer from submitting a surety bond as an acceptable performance guarantee; and (2) requires the posting of the performance guarantee before the developer's application for final subdivision is deemed complete. We agree with plaintiff's contentions and accordingly reverse.

Plaintiff is the owner of property located in Colts Neck, designated as Block 23, Lot 20, on the official tax map. Plaintiff applied to the Colts Neck Township Planning Board for final major subdivision approval subdividing the subject property into twelve lots. Plaintiff's application was subject to § 412 of the Township's DRO. Section 412 limits the acceptance of performance guarantees to irrevocable letters of credit and/or certified check. It also provides that a developer must submit the required performance guarantee as a prerequisite to the Planning Board certify-

ing a developer's application for final major subdivision approval as complete.

The Township's engineer determined that the aggregate performance guarantees required for the proposed subdivision amounted to $389,300. Plaintiff, through its attorney, advised the Township by letter that the provisions of § 412 of the DRO did not comply with the definitions and requirements of the MLUL, and requested that Colts Neck accept plaintiff's proffered surety bond as its performance guarantee. Plaintiff thereupon submitted ten percent of the engineer's estimate of $389,300, in the form of a certified and/or bank check and ninety percent, $350,370, in the form of an original surety bond issued by Frontier Insurance Company. The Planning Board advised plaintiff that its application for final major subdivision approval was incomplete because a surety bond was not an acceptable form of performance guarantee pursuant to § 412 of Colts Neck's DRO.

Colts Neck's engineer thereafter revised the estimate for the amount required as a performance guarantee to $309,260. Plaintiff, under protest, submitted to Colts Neck a cashier's check in the amount of $270,330 to satisfy the balance of the performance guarantee requirement.

Plaintiff thereafter filed an action in lieu of prerogative writs challenging the validity of § 412 Colts Neck's DRO. It also sought "compensatory damages" as well as costs of suit and attorneys fees. Colts Neck moved for summary judgment, arguing that plaintiff's complaint was barred by the Tort Claims Act, *N.J.S.A.* 59:1-1 to *N.J.S.A.* 59:14-4, and that its DRO conformed in every respect to the provisions of the MLUL. The motion judge agreed, concluding that, with the exception of irrevocable letters of credit issued under *N.J.S.A.* 40:55D-53.5 and cash, the MLUL gives municipalities the discretion to determine, by ordinance, what type of performance guarantees they will accept. He observed that Colts Neck's purpose in refusing to accept surety bonds, to avoid the possibility of delay or litigation in recovering from the surety, was a reasonable exercise of the Township's legislative discretion.

He further held that the requirement that a developer submit an acceptable performance guarantee as a condition precedent to deeming the developer's application complete was not improper because the MLUL allows municipalities to require guarantees "as a condition to final site plan approval."

I

*N.J.S.A.* 40:55D–53a provides in part:

> Before recording of final subdivision plats or as a condition of final site plan approval or as a condition to the issuance of a zoning permit pursuant to subsection d. of section 52 of P.L.1975, c. 291 ( [*N.J.S.A.*] 40:55D–65), *the approving authority may require and shall accept in accordance with the standards adopted by ordinance for the purpose of assuring the installation and maintenance of on-tract improvements* . . . [t]he furnishing of a performance guarantee. . . .
>
> [Emphasis added.]

*N.J.S.A.* 40:55D–6 defines "performance guarantee" as "any security, which may be accepted by a municipality, including but not limited to surety bonds, letters of credit under the circumstances specified in section 16 of P.L.1991, c. 256 ([*N.J.S.A.*] 40:55D–53.5), and cash." Plaintiff argues that, by defining performance guarantees as "any security . . . including but not limited to surety bonds, letters of credit . . . and cash," the Legislature intended that a municipality be required to accept a surety bond as a form of performance guarantee. Colts Neck counters that the language "including but not limited to surety bonds, letters of credit . . . and cash" was intended to be merely illustrative of the type of securities "which may be accepted by the municipality." The Township reasons that ultimately, under *N.J.S.A.* 40:55D–53, it has the unqualified discretion to require a single type of security, such as irrevocable letters of credit, in accordance with the "standards adopted by ordinance."

We reject Colts Neck's argument. Prior to 1991, *N.J.S.A.* 40:55D–6 defined performance guarantee as "any security, which may be accepted by a municipality, including cash; . . . ." By P.L.1991, c. 256, § 2, the Legislature added the language "including but not limited to surety bonds, letters of credit under the

circumstances specified in ( [*N.J.S.A.*] 40:55D–53.5), and cash."
The Committee Statements attached to Assembly Bill No. 1440,[1]
ultimately passed into law, state that "[s]ection 2 *changes* the
definition of 'performance guarantee' in [*N.J.S.A.* 40:55D–6] to
*include* surety bonds and certain letters of credit." (Emphasis
added). To us, the statements express a clear legislative mandate
that municipalities accept surety bonds and certain letters of
credit as performance guarantees. It is a legislative acknowledge-
ment that such forms of security are acceptable. The amendment
strikes a fair balance; it gives the developer, who may not have
the immediate financial wherewithal to secure an irrevocable letter
of credit, the option to file a surety bond, and provides the
municipality with satisfactory security in the form of a bond,
acceptable in form to the municipal attorney, issued by a qualified
surety institution.

Further, an amendment to a statute ordinarily implies a
purposeful alteration in substance. *Stauhs v. Board of Review*, 93
*N.J.Super.* 451, 457, 226 *A.*2d 182 (App.Div.1967). If a statute
amends a previous law, we must seek to uncover the intention by
examining the old law, the matters deemed to require correction
and the remedy enacted. *Newark v. Township of Hardyston*, 285
*N.J.Super.* 385, 395, 667 *A.*2d 193 (App.Div.1995), *certif. denied*,
143 *N.J.* 518, 673 *A.*2d 277 (1996). The statute should not be read
so as to "render the amendments futile and abortive," *ibid.*, or
meaningless or superfluous. *In re Sussex County Mun. Util.
Auth.*, 198 *N.J.Super.* 214, 217, 486 *A.*2d 932 (App.Div.), *certif.
denied*, 101 *N.J.* 267, 501 *A.*2d 934 (1985). Prior to the 1991
amendment, a municipality had the unqualified power to accept or
reject any form of security, including surety bonds and letters of

---

[1] The legislative committees were the Senate Land Use Management and
Regional Affairs Comm. and the Assembly Mun. Gov't Comm., *Statements to
Assembly Bill No. 1440* (1991). The statements note that the 1991 revisions were
the result of "extensive deliberations by the Municipal Land Use Law Drafting
Committee," a body of experts in the land use field which had monitored the
working of the MLUL since its first revision in 1979.

credit. Colts Neck's contention that the 1991 amendatory language was simply to illustrate the type of security a municipality could accept or reject renders the amendatory language meaningless and superfluous; there was no reason to illustrate the type of security a municipality could accept in view of its unqualified discretion under the prior language of the statute. Adding the language "including but not limited to surety bonds, letters of credit" was a purposeful alteration of the prior law, limiting that discretion by mandating acceptance of such securities upon tender, in proper form, by the developer.

We recognize that the definition of performance guarantee includes the language "any security, *which may be accepted by a municipality* ...." *N.J.S.A.* 40:55D-6 (emphasis added). However, the definition refers to "*any* security." (Emphasis added). The performance guarantee may take one of several forms: a surety bond, irrevocable letter of credit, cash, a bank certificate or savings passbook "and in some cases, even a blanket mortgage lien on the premises which are the subject of the development...." William M. Cox, *New Jersey Zoning and Land Use Administration* § 24-7 at 449 (Gann 1998). The form of the guarantee must be approved by the municipal attorney. *Ibid.* We construe the language "which may be accepted by the municipality" as intending to vest in the municipality the discretion to accept or reject such forms of security, other than surety bonds, irrevocable letters of credit, and cash. The municipality and developer may conclude, for example, that a blanket mortgage is cost-saving to the developer and provides ample security to the municipality, provided that the securing documents are acceptable in form to the municipal attorney.

Finally, the trial judge accepted Colts Neck's argument that *N.J.S.A.* 40:55D-53.5, dealing with letters of credit, was significant in construing the definition of performance guarantees under *N.J.S.A.* 40:55D-6. *N.J.S.A.* 40:55D-53.5 reads as follows:

> The approving authority *shall*, for the purposes of section 41 of P.L.1975, c. 291 ( [*N.J.S.A.*] 40:55D-53), accept a performance guarantee or maintenance guarantee which is an irrevocable letter of credit if it:

a. Constitutes an unconditional payment obligation of the issuer running solely to the municipality for an express initial period of time in the amount determined pursuant to section 41 of P.L.1975, c. 291 ( [*N.J.S.A.*] 40:55D–53);

b. Is issued by a banking or savings institution authorized to do and doing business in this State;

c. Is for a period of time of at least one year; and

d. Permits the municipality to draw upon the letter of credit if the obligor fails to furnish another letter of credit which complies with the provisions of this section 30 days or more in advance of the expiration date of the letter of credit or such longer period in advance thereof as is stated in the letter of credit.

[Emphasis added.]

Colts Neck argues that "the clear implication of this section is that, in its absence, the municipality would be free to refuse the acceptance of letters of credit as a performance guarantee." In contrast, it notes that:

the M.L.U.L. does not contain any language requiring the acceptance of surety bonds as a form of performance guarantee as it does in the case with letters of credit. Thus, read in its entirety, and implicit within the M.L.U.L., a municipality is free to enact standards which preclude the posting of surety bonds as a form of performance guarantee.

We do not agree.

Implicit in the enactment of § 53.5 is the Legislature's awareness of some municipalities' unwillingness to accept letters of credit prior to 1991. It may be that some municipal attorneys were unfamiliar with the forms of letters of credit offered by banking institutions, or the technical language utilized in commercial financing. *See N.J.S.A.* 12A:5–101 to –117. Or it may have been the reluctance on a municipality's part to accept letters of credit because of the precarious state of some banking institutions in the late 1980's. It has been suggested that § 53.5 was a response to this reticence.

During the 1980's many municipalities sought to alleviate this pattern by accepting in lieu of bonds so-called "irrevocable letters of credit" pursuant to which a municipality could, by the language of the document, simply demand payment from a bank and receive it immediately if the developer defaulted.

Unfortunately, the late 1980's and early 1990's saw a period in time when, as the economy worsened, many developers, unable to sell their product or even to get further construction financing, defaulted on their obligations to construct subdivision and site plan improvements. Even more unfortunately, at this time, many banks and other lending institutions went into default. Thus, the municipality

faced a two-fold default on guarantees. Not only did the developers fail to make improvements, but the guaranteeing financial institutions, now controlled by federal receivers, actually revoked these "irrevocable" letters of credit, leaving the municipalities of New Jersey with millions of dollars of worthless "performance guarantees."

The 1991 amendment to the Municipal Land Use Law [*N.J.S.A.* 40:55D-53.5] defined the circumstances under which a municipality must accept a letter of credit as a performance guarantee.

[Michael A. Pane, *Local Government Law*, 35 *New Jersey Practice* § 526 at 437 (1993).]

We construe *N.J.S.A.* 40:55D-53.5 as responding to a specific problem, municipalities' reluctance to accept letters of credit, rather than a legislative expression that a municipality must accept letters of credit, but may reject surety bonds as a form of performance guarantees. The statutory definition amounts to a legislative directive that municipalities accept letters of credit which comply with the provisions of § 53.5. *See Manalapan Builders Alliance, Inc. v. Township Comm. of Manalapan,* 256 *N.J.Super.* 295, 306, 606 *A.*2d 1132 (App.Div.1992). The lack of a separate section pertaining to surety bonds simply indicates that such bonds are presumptively acceptable; they do not need to meet additional requirements as do irrevocable letters of credit.

While the MLUL confers authority upon municipalities to enact standards for the acceptance of performance guarantees by adoption of an ordinance, the ordinance must conform with the provisions of the act. *Id.* at 304, 606 *A.*2d 1132. Colts Neck's refusal to accept surety bonds contradicts the statutory definition of performance guarantees. *Id.* at 305, 606 *A.*2d 1132. In the absence of specific authority to limit the form of performance guarantees, Colts Neck lacks such power. *See Eastern Planned Communities at Lincroft, Inc. v. Middletown Township,* 235 *N.J.Super.* 467, 470, 563 *A.*2d 81 (Law Div.1989) (holding that Middletown Township had no authority to require bonds to ensure that homeowners' association was formed for cluster development).

## II

As stated, § 412 of the Colts Neck ordinance also requires a developer to post a performance guarantee as a condition precedent to the planning board's acceptance of the developer's application as complete. It reads as follows:

The proposed performance guarantee shall be submitted to the [approving] authority by the developer. The approving authority shall review the proposed performance guarantee for accuracy and form and then submit it to the governing body for approval and acceptance by resolution. *Final plat application shall not be accepted until the performance guarantee has been accepted and approved by the governing body.*

[Emphasis added.]

Plaintiff argues that this provision violates the MLUL, and we agree.

The Legislature delegated authority to municipalities to require a performance guarantee as a means of assuring the installation of on-site improvements. *N.J.S.A.* 40:55D–53. A municipality may require a performance guarantee only at three specific times: (1) "[b]efore recording of final subdivision plats"; (2) "as a condition of final site plan approval"; or (3) "as a condition to the issuance of a zoning permit." *Ibid.* It is well-settled that if statutory language is plain and unambiguous, a court's function is to enforce the statute as written. *Cornblatt v. Barow,* 153 *N.J.* 218, 231, 708 *A.*2d 401 (1998). *N.J.S.A.* 40:55D–53 is plain and unambiguous; the statutory language does not allow a municipality to reject a major subdivision application until the developer's performance guarantee has been accepted and approved by the governing body.

The motion judge concluded:

The plaintiff has also argued that the Township ordinance is improper because it required performance guarantees before the acceptance of an application for final subdivision or site plan approval. *However, the statute allows municipalities to require guarantees as a condition of final site plan approval. It is therefore entirely reasonable for the municipality to require the guarantees before they accept an application for final site plan approval.*

[Emphasis added.]

First, what is involved here is a major subdivision application, not final site plan approval. The statute states unequivocally that a municipality may require the performance guarantee "[b]efore recording of final subdivision plats. . . ." *N.J.S.A.* 40:55D–53a. Second, *N.J.S.A.* 40:55D–53 reasonably limits a municipality to requiring a performance guarantee only as a condition of the municipality taking some final action; recordation of final subdivision plats; granting final site plan approval; or issuance of a zoning permit. This scheme protects both the developer and the municipality. A developer is only required to post a performance guarantee at a stage when it is reasonably assured its project will be approved. The municipality is assured that the installation of necessary improvements will occur. Colts Neck's requirement that developers post performance guarantees "accepted and approved by the governing body" prior to deeming the developer's application complete is clearly outside the scope of its authority under *N.J.S.A.* 40:55D–53. The provision is invalid because it does not comply with the requirements of the enabling statute. *Riggs v. Township of Long Beach,* 109 *N.J.* 601, 611, 538 *A.*2d 808 (1988).

## III

As an alternative ground for denying plaintiff relief, the trial judge concluded that plaintiff's demand for recovery of the interest on the cash deposited with the municipality was barred by the Tort Claims Act, *N.J.S.A.* 59:2–3b, which provides that a public entity is not liable for legislative or judicial action or inaction, or administrative action or inaction of a legislative or judicial nature. We disagree. The nature of plaintiff's claim is equitable; it seeks only the recovery of interest on monies it was required to pay under protest. Nothing in the Tort Claims Act affects "liability based on contract or the right to obtain relief other than damages against the public entity or one of its employees." *N.J.S.A.* 59:1–4. *See also Slocum v. Borough of Belmar,* 233 *N.J.Super.* 437, 440, 559 *A.*2d 17 (Law Div.1989) (holding that a demand for a rollback in future beach fees to compensate

beachgoers for excess fees collected in prior years was not a demand for "damages" under the Act and therefore not subject to the Act's procedural requirements).

*N.J.S.A.* 40:55D-53.1 entitles a municipality to retain, for administrative expenses, a sum equivalent to no more than thirty-three and one-third percent of interest paid on deposits with a municipality made in accordance with *N.J.S.A.* 40:55D-53. It is unclear from plaintiff's brief and arguments before us whether it is seeking to recoup the total or just a portion of interest earned on the cash deposited in protest with the municipality. Further, the amount of interest earned has not been disclosed to us. Finally, Colts Neck's position regarding the return of the interest has not been articulated before us. We therefore remand the matter for the trial court's consideration of this issue.

Reversed and remanded for further proceedings consistent with this opinion.