754 A.2d 525

HELEN KASPER, PETITIONER–APPELLANT, v. BOARD OF TRUSTEES OF THE TEACHERS' PENSION AND ANNUITY FUND, RESPONDENT–RESPONDENT.

Argued March 13, 2000—Decided July 18, 2000.

570

*Helen Kasper,* argued the cause *pro se.*

*Mark J. Fleming,* Assistant Attorney General, argued the cause for respondent (*John H, Farmer, Jr.,* Attorney General of New Jersey, attorney; *Mary C. Jacobson,* Assistant Attorney General, of counsel; *Beatrice Michelle Albertson,* on the brief).

*Richard A. Friedman,* argued the cause for *amicus curiae,* New Jersey Education Association (*Zazzali, Zazzali, Fagella & Nowak,* attorneys; *Edward M. Suarez, Jr.,* on the brief).

The opinion of the Court was delivered by

LONG, J.

In 1991, petitioner Helen Kasper was working as an educational media specialist for the Newark Board of Education and was enrolled in the Teacher's Pension and Annuity Fund. On May 31, 1991, Ms. Kasper arrived at school at 7:45 a.m. Although the school day officially began at 8:30 a.m., Ms. Kasper came early, as she had every morning for nine months, because the school principal required that certain media materials be distributed to various classrooms prior to the official start of classes.

According to Ms. Kasper, her duties included distributing media materials requested by teachers each morning. Ms. Kasper stated that the principal was aware of her early arrivals and approved that practice. The other media specialist chose not to arrive prior to the 8:30 a.m. opening; consequently, Ms. Kasper had to do most of the early distribution.

That morning, Ms. Kasper parked her car and proceeded across the street to school property. As she climbed the school steps to the front door of the building, a man grabbed her purse and pulled her to the ground. Ms. Kasper did not remember falling but she was found face down on the ground by the school principal a few moments after the attack. Her purse had been stolen and she suffered several injuries.

Ms. Kasper continued to work until September 1, 1996, when she filed a claim for accidental disability retirement benefits pursuant N.J.S.A. 18A:66–39(c).[1] The Teachers' Pension and Annuity Fund Board ("Board") subsequently determined that Ms. Kasper was totally and permanently disabled from the performance of her duties, that her disability was the direct result of a "traumatic event" and that she qualified for an ordinary service retirement. However, the Board denied Ms. Kasper's application for accidental disability retirement benefits because the traumatic event did not occur "during and as a result of the performance of her regular or assigned duties" as required by statute.

Ms. Kasper challenged the Board's determination. Following a hearing, the Administrative Law Judge (ALJ) recommended to the Board that it deny Ms. Kasper accidental disability retirement.

The ALJ found that a traumatic event occurred while Ms. Kasper was "within the physical boundaries of her place of employment"; that she "had voluntarily come to the school to perform regular or assigned duties before hours"; and that her doing

---

[1] We note that Ms. Kasper filed her claim for benefits out of time under the five year statute of limitations. N.J.S.A. 18A:66–39(c). However, the Board waived that defect.

so had not violated any work rules of her employer. The ALJ framed the dispositive question before him as whether Ms. Kasper "had actually completed her regular morning commute to work and had commenced the voluntary portion of her work day...." The ALJ reasoned that "an event which occurs before 'performance' and before arrival 'at a place of employment' cannot serve as the predicate event for an accidental disability pension award":

Ms. Kasper had entered the school's physical property, but not yet into the building itself. Her physical presence within the school grounds at the time of the assault is not a factor sufficient to overcome the reality that the assault actually occurred as she neared the end of her normal commute to work. It seems clear that had she been assaulted in the public roadway in front of the school, off of the property owned by the Board, she could not realistically claim to have commenced her performance of duties at the moment of the assault. The fact that she took a few steps more onto the Board's property is not sufficient to remove this incident from an event which occurred during the 'coming' stage to one occurring after commencement of duties, nor does that statutory amendment expanding the scope of duties to include voluntary performance of duties before or after required hours of employment avail the claimant. There were no duties for Ms. Kasper to perform until she at least entered the building. Again, the harder question would be posed if the assault had occurred within the school building while she was proceeding down the corridor and before she reached the principal's office and actually began her duties.

The Board agreed and denied Ms. Kasper an accidental disability pension.

In an unpublished opinion, the Appellate Division affirmed the Board's determination. Applying the traditional principle that a reviewing court must accord an agency determination great deference, the Appellate Division held that "Kasper's regular early arrival at work ... did not convert the assault occurring outside the school building to a traumatic event occurring during the voluntary performance of her regular or assigned duties."

We granted Ms. Kasper's petition for certification. 162 N.J. 661, 745 A.2d 1212 (1999). On appeal, she claims that the ALJ and the Appellate Division erred by not considering the impact of a 1986 amendment to N.J.S.A. 18A:66–39(c) that states:

A traumatic event occurring during voluntary performance of regular or assigned duties at a place of employment before or after required hours of employment which is not in violation of any valid work rule of the employer or otherwise

prohibited by the employer shall be deemed as occurring during the performance of regular or assigned duties.

She argues that that language expanded the meaning of the phrase "during and as result of the performance of his regular or assigned duties." She also contests the conclusions of the ALJ and the Appellate Division because they were "based on workers' compensation principles" that do not govern accidental disability claims. The New Jersey Education Association filed a brief supporting Ms. Kasper.

The Board counters that Ms. Kasper's interpretation of *N.J.S.A.* 18A:66–39(c) is incorrect. In support, it argues that Ms. Kasper was not in a "pre-shift period" to her duties; that she had not entered the school building or started her workday; and that she was in transit, albeit almost to the door of her workplace, when the incident took place. Thus, the Board maintains that Ms. Kasper is not entitled to accidental disability because she was not injured during and as a result of the performance of her regular or assigned duties.

I.

Pursuant to the Teachers' Pension and Annuity Fund Law (TPAF), *N.J.S.A.* 18A:66–1 to –93, there are two ways in which an education professional can receive retirement benefits upon becoming permanently incapacitated: ordinary disability and accidental disability. *N.J.S.A.* 18A:66–39(b) and (c). Ordinary disability is conferred when a teacher, who is a member of the retirement system, is "physically or mentally incapacitated for the performance of duty and should be retired." *N.J.S.A.* 18A:66–39(b). Accidental disability is awarded

if a member is permanently and totally disabled as a direct result of a traumatic event occurring during and as a result of the performance of his regular or assigned duties....

[*N.J.S.A.* 18A:66–39(c).]

Those pensions are dramatically different. A person retired on an ordinary disability pension is guaranteed an allowance of at least forty percent of his or her final compensation, whereas one retired

on an accidental disability pension is guaranteed two-thirds of his or her actual annual compensation at the time of the accident. *N.J.S.A.* 18A:66–41 and 18A:66–42; *Steinmann v. State, Dept. of Treasury, Div. of Pensions, TPAF,* 116 *N.J.* 564, 567, 562 *A.*2d 791 (1989). Because higher benefits flow to the recipient of an accidental disability award than to one who receives an ordinary disability award, *Maynard v. Board of Trustees, TPAF,* 113 *N.J.* 169, 172, 549 *A.*2d 1213 (1988), the standards applicable to the former are more stringent than those applicable to the latter. To receive an ordinary disability pension, incapacitation is all that is required. To qualify for an accidental disability retirement benefit, the applicant must (1) be permanently and totally disabled (2) as a direct result (3) of a traumatic event (4) that occurred during and as a result of the performance of regular job duties.

The other major public employee pension funds (Public Employees' Retirement System (PERS), *N.J.S.A.* 43:15A–1 to –141, and the Police and Firemen's Retirement System (PFRS), *N.J.S.A.* 43:16A–1 to –68) are governed by accidental disability provisions identical to the TPAF. *N.J.S.A.* 43:15A–43 and *N.J.S.A.* 43:16A–7.

The present version of *N.J.S.A.* 18A:66–39(c) is different from its predecessor. The accidental disability section in the original TPAF, *L.* 1955 *c.* 37, § 39, read as follows:

> A [TPAF] member who has not attained age 70 shall ... be retired by the [PERS] board of trustees, if said employee is disabled as a result of personal injuries sustained in or from an accident arising out of and in the course of his employment, on an accidental disability allowance.

Under that statute, an applicant had to prove that (1) he or she was disabled (2) as a result of personal injuries (3) sustained in an accident (4) arising out of or in the course of his or her employment.

One key to evaluating accidental disability retirement claims under the old statute was whether the alleged disability was the result of an accident "arising out of and in the course of the employee's employment." *Maynard, supra,* 113 *N.J.* at 171, 549 *A.*2d 1213. That statutory language was virtually identical to the language found in the Workers' Compensation Act. *N.J.S.A.*

34:15–1. Thus, in early accidental disability cases, courts were influenced strongly by developments in the workers' compensation field. *Getty v. Prison Officers' Pension Fund,* 85 *N.J.Super.* 383, 390, 204 *A.*2d 883 (App.Div.1964) (using rationale from workers' compensation cases to determine that disability claimant need only show "reasonable probability" that ordinary work effort or strain contributed to injury); *Fattore v. Police and Firemen's Retirement System,* 80 *N.J.Super.* 541, 549, 194 *A.*2d 363 (App.Div.) (holding that "principles of the Workmen's Compensation Act as construed should be applied in passing upon the issue of causal connection between the work effort and the alleged accidental injury" in public employee disability pension actions), *certif. denied,* 41 *N.J.* 245, 196 *A.*2d 6 (1963); *Roth v. Board of Trustees, PERS,* 49 *N.J.Super.* 309, 317, 139 *A.*2d 761 (App.Div.1958) (following standards for employment-relation in workers' compensation field to award PERS death benefits).

In 1966 and 1967, there was a "concerted legislative effort to effect a basic change in the standards for awarding accidental disability retirement pensions"; identical amendments were enacted with respect to the accidental disability pensions provided in the several major state pension systems that "changed [them] fundamentally." *Gerba v. Board of Trustees, PERS,* 83 *N.J.* 174, 183, 416 *A.*2d 314 (1980). Those amended statutes included the TPAF Law.[2] The amendments provided that, in order to receive accidental disability benefits, an employee must establish that he or she was "permanently and totally disabled as a direct result of a traumatic event occurring during and as a result of the performance of his regular or assigned duties." *See N.J.S.A.* 18A:66–39(c). Thus, the statute was clearly altered in four ways: "disability" became "permanent and total disability"; "accident" became "traumatic event"; "result" became "direct result"; and "arising out of and in the course of employment" became "during and as a

---

[2] *L.* 1966, *c.* 66, § 2 (revising *N.J.S.A.* 18:13–112.41) and *L.* 1967, *c.* 271, subtitle 10, chapter 66, § 39(c) (replacing Title 18 with Title 18A) (*N.J.S.A.* 18A:66–39).

result of the performance of his regular or assigned duties." Those amendments expressed the Legislature's disapproval of decisions that had applied workers' compensation principles in determining what constituted an "accident" in the pension context.[3] *Russo v. Teachers' Pension and Annuity Fund,* 62 *N.J.* 142, 149, 299 *A.*2d 697 (1973).

We have already declared that the purpose of those amendments was to make the granting of an accidental disability pension more difficult. *Cattani v. Board of Trustees, PFRS,* 69 *N.J.* 578, 586, 355 *A.*2d 625 (1976); *Gerba, supra,* 83 *N.J.* at 183, 416 *A.*2d 314. We have also specifically addressed two of the four changes brought about by the amendment. First, the traumatic event language obviously raised the bar for determining what kind of an injury qualified a petitioner for an accidental disability pension. *Gable v. Board of Trustees, PERS,* 115 *N.J.* 212, 219–20, 557 *A.*2d 1012 (1989) (citing *Cattani, supra,* 69 *N.J.* at 586, 355 *A.*2d 625). *See Russo, supra,* 62 *N.J.* at 153–54, 299 *A.*2d 697 (recognizing that substitution of phrase "traumatic event" for "accident" was intended to create narrower class of situations in which accidental disability pensions were granted).

> [T]o be eligible for accidental disability retirement allowance, a worker must demonstrate (1) that his injuries were not induced by the stress or strain of the normal work effort; (2) that he met involuntarily with the object or matter that was the source of the harm; and (3) that the source of the injury itself was a great rush of force or uncontrollable power.
>
> [*Kane v. Board of Trustees, PFRS,* 100 *N.J.* 651, 663, 498 *A.*2d 1252 (1985).]

In short, "the legislature intended that an accidental disability pension ought to be awarded in cases of serious and permanent harm to the worker, in which the worker himself is exposed to a violent level of force or impact." *Id.* at 662, 498 *A.*2d 1252.

---

[3] Of particular concern to the Legislature was *Ciuba v. Irvington Varnish & Insulator Co.,* 27 *N.J.* 127, 139, 141 *A.*2d 761 (1958), where we held that a heart attack that causes or accelerates death, is an "accident" within the meaning of the workers' compensation statute and that no further unexpected external event is required. *Russo, supra,* 62 *N.J.* at 149, 299 *A.*2d 697.

We have likewise recognized that the purpose behind the Legislature's change of the term "result" to "direct result" was "intended to impose a stringent test of medical causation and ... that the trauma ... must at the very least be the essential significant or the substantial contributing cause of the disability." *Korelnia v. Board of Trustees, PERS,* 83 *N.J.* 163, 170, 416 *A.*2d 308 (1980) (citing *Gerba, supra,* 83 *N.J.* at 186, 416 *A.*2d 314). In both instances, we concluded that the legislative focus was to narrow the cases that would qualify for an accidental disability pension.

## II.

We have not specifically addressed the Legislature's intent in substituting "occurring during and as a result of the performance of [ ] regular or assigned duties" for the original statutory language of "arising out of and in the course of [ ] employment." The legislative history of the statute is silent on that issue. It is for us to determine its purpose. *V.C. v. M.J.B.,* 163 *N.J.* 200, 217, 748 *A.*2d 539 (2000); *Higgins v. Pascack Valley Hosp.,* 158 *N.J.* 404, 418–19, 730 *A.*2d 327 (1999); *Lesniak v. Budzash,* 133 *N.J.* 1, 8, 626 *A.*2d 1073 (1993).

Any such analysis begins with the language of the statute which, if clear, governs. *State v. Mortimer,* 135 *N.J.* 517, 532, 641 *A.*2d 257, *cert. denied,* 513 *U.S.* 970, 115 *S.Ct.* 440, 130 *L.Ed.*2d 351 (1994); *Kimmelman v. Henkels & McCoy Inc.,* 108 *N.J.* 123, 128, 527 *A.*2d 1368 (1987). When an amendment is concerned, the Legislature cannot be presumed to have regarded the change as meaningless. *Nagy v. Ford Motor Co.,* 6 *N.J.* 341, 347–48, 78 *A.*2d 709 (1951). On the contrary, the general rule is that a change is presumed to evidence a departure from the old law. *Gatto Design & Dev. Corp. v. Township of Colts Neck,* 316 *N.J.Super.* 110, 115, 719 *A.*2d 707 (App.Div.1998); *In re Sussex County Mun. Util. Auth.,* 198 *N.J.Super.* 214, 217, 486 *A.*2d 932 (App.Div.), *certif. denied,* 101 *N.J.* 267, 501 *A.*2d 934 (1985). The presumption is strongest when, as here, the entire statute was not overhauled but an isolated independent amendment was enacted.

*Ridge Erection Co. v. Mountain States Tel. & Tel. Co.*, 37 *Colo. App.* 477, 549 *P.*2d 408, 411 (1976); *North River Ins. Co. v. Gibson*, 244 *S.C.* 393, 137 *S.E.*2d 264, 266 (1964).

## III.

The original version of the accidental disability statute read "arising out of and in the course of employment." The amendment reads "during and as a result of the performance of his regular or assigned duties." Prior to the 1966 amendment, the phrase "arising out of and in the course of employment" had a well-established meaning in the workers' compensation law; understanding that meaning is crucial to understanding the 1966 amendment to the accidental disability statute.

Volumes have been written about what injuries "arise out of and in the course of employment" in the workers' compensation context. Traditionally, for workers' compensation purposes, the notion of "arising out of and in the course of employment" encompassed only accidents occurring on the employer's premises. That so-called "premises rule" has been characterized as serving the twin goals of certainty and fairness. 1 Arthur Larson, *The Law of Workmen's Compensation*, § 15.10 (1990). *See Livingstone v. Abraham & Straus, Inc.*, 111 *N.J.* 89, 96, 543 *A.*2d 45 (1988) (noting that premises rule was developed to "facilitate the task of distinguishing compensable from non-compensable incidents"); *Morris v. Hermann Forwarding Co.*, 18 *N.J.* 195, 197–98, 113 *A.*2d 513 (1955) (commenting that because industry must carry burden of worker's compensation benefits, employee must prove casual connection between employment and injury).

Out of that basic test for compensability came a necessary concomitant, "the going and coming rule, which ordinarily precluded an award of compensation benefits for injuries sustained during routine travel to and from an employee's regular place of work." *Livingstone, supra*, 111 *N.J.* at 96, 543 *A.*2d 45. The going and coming rule refers to the prohibition against compensability for injuries occurring while an employee is going to or coming from

work. 1 Larson, *supra*, § 15.11. Like the premises rule from which it arose, the going and coming rule allows employers and insurers to predict their expected costs and, at the same time, insures fairness because an employee's routine trip to and from work yields neither special benefit to the employer nor results in a special risk to the employee. *Ibid.; Morris, supra,* 18 *N.J.* at 197–98, 113 *A.*2d 513.

As time passed however, our courts chipped away at the going and coming rule with regularity and expanded compensability far beyond the confines of the employer's premises. In *Hammond v. Great Atlantic & Pacific Tea Co.,* 56 *N.J.* 7, 14, 264 *A.*2d 204 (1970), we detailed that erosion:

These exceptions include situations where the employee is on a special mission for his employer, where the employer furnishes transportation to and from the place of employment, where the use of an automobile or other form of vehicle is required in the performance of the contract of service, and where the employer pays for the employee's transportation. Even these exceptions have been broadly construed to comport with the liberal philosophy behind the enactment of the Workmen's Compensation Act. Thus in *Ricciardi.[v. Damar Products Co.,* 45 *N.J.* 54, 211 *A.*2d 347 (1965) ], an accident occurring on the way home from a company picnic was held to be compensable within the special mission exception. And in *Lehigh [Navigation Coal Co. v. McGonnell,* 120 *N.J.L.* 428, 199 *A.* 906 (Sup.Ct.1938), *aff'd o.b.* 121 *N.J.L.* 583, 3 *A.*2d 581 (E. & A.1939) ], compensation was allowed when an employee was killed after his employer had provided a commutation ticket for railroad commutation although the accident occurred 75 to 100 feet from the place where he would board the train.

The large number of exceptions and their application by the courts have led one commentator to remark that "the exceptions are so numerous that they have swallowed the rule." (Citations omitted).

Ultimately, in 1979, the definition of employment in the Workers' Compensation Act was amended to abrogate the judicially created exceptions to the going and coming rule. Senate Labor, Industry and Professions Committee, *Joint Statement to Senate Committee Substitute for Sen. No. 802 and Assembly Committee Substitute for Assem. No. 840,* at 2 (Nov. 13, 1979). Employment is now defined as commencing "when an employee arrives at the employer's place of employment to report for work and shall terminate when the employee leaves the employer's place of

employment, excluding areas not under the control of the employer." *N.J.S.A.* 34:15–36.

As we noted, legislative history surrounding the 1966 and 1967 amendments to the accidental disability statute is sparse. Nevertheless, it seems clear that substitution of the language "during and as a result of the performance of his regularly assigned duties" for the phrase "arising out of and in the course of" was premonitory of the 1979 amendment to the workers' compensation statute and was intended to reestablish the integrity of the premises rule and eliminate the judicially created exceptions to the going and coming rule. Thus, under *N.J.S.A.* 18A:66–39(c), in order to qualify for an accidental disability pension, the accident must occur on premises owned or controlled by the employer, and not during activities encompassed within the myriad of coming and going exceptions that had sprung up. To assure that result, the Legislature added the caveat that the accident had to take place "during and as a result of the performance of [the employee's] regular and assigned duties,"—a standard that could not be satisfied by a commuting accident. That standard must be understood as restorative and not transformative.

## IV.

Several administrative decisions have addressed the issue before us. They are important because, in interpreting amendments to statutes, courts often give substantial weight to prior interpretations by the agency charged with implementing the statute.

[T]he courts will generally show great deference to an agency's interpretation of a statute. A reviewing court should accord considerable weight to an executive department's construction of the statutory scheme it is entrusted to administer. The court will give a heightened degree of deference to the agency's interpretation when the statute is within the agency's field of expertise, and less deference to agency construction and interpretation of a statute which has not previously been subjected to judicial scrutiny or time-tested agency interpretations.

[2 *Am.Jur.*2d *Admin. Law* § 524 (1994) (footnotes omitted).]

*See New Jersey Turnpike Auth. v. American Fed. of State, County and Mun. Employees, Council 73*, 150 *N.J.* 331, 351, 696

*A.2d* 585 (1997); *Merin v. Maglaki,* 126 *N.J.* 430, 437, 599 *A.*2d 1256 (1992).

Furthermore, when the Legislature has not addressed the precise question of statutory meaning, the reviewing court may not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

To uphold an agency's construction of a statute that is silent or ambiguous with respect to the question at issue, a reviewing court need not conclude that the agency construction was the only one it permissibly could have adopted, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding.

[2 *Am.Jur.*2d *Admin. Law* § 525 (1994) (footnotes omitted).]

*See Metromedia, Inc. v. Director, Div. of Taxation,* 97 *N.J.* 313, 327, 478 *A.*2d 742 (1984).

Although we might quibble with the application in one or two agency decisions, they uniformly incorporate the standard to which we have adverted: that an employee cannot be "coming or going" to work, but must be engaged in his or her employment duties on property owned or controlled by the employer in order to qualify for an accidental disability pension. *See, e.g., Lewis–Miles v. Board of Trustees, PERS,* TYP 8932–96, Initial Decision, 1998 *WL* 656533 (July 16, 1998), *adopted,* (Aug. 20, 1998)[4] (holding that employee was not injured during and as result of performance of duties but was still commuting when, shortly after driving through front gate of employer's facility, her car slid on ice and struck oncoming car head-on; employee had not yet reached her normal work location, had not signed in, and had not begun her usual work duties); *Estate of Matza v. Board of Trustees, TPAF,* 96 *N.J.A.R.*2d (TYP) 224, 1996 *WL* 777047 (1996) (holding that teacher who slipped and fell on ice while walking across school parking lot towards school was "on his way to work and was not yet in the performance of his duties at the time of the

---

[4] The Office of Administrative Law has changed its publication method. Current opinions are now found at http://lawlibrary.rutgers.edu/oal/search.html.

incident"); *Loftus v. Board of Trustees, TPAF*, 95 *N.J.A.R.*2d (TYP) 14, 1994 *WL* 738150 (1994) (concluding that teacher, who was home sick but was required to visit school in afternoon to drop off students' grades, was not injured during and as result of duties when she crashed her car in front of school building); *Osborne v. Board of Trustees, PFRS*, 93 *N.J.A.R.*2d (TYP) 1, 1992 *WL* 438361 (1992) (denying compensation to police officer who was on his way to work for 10:30 start time and was injured in car accident at 10:27, even though officer subsequently used police car radio, that was routinely used to respond to calls while off-duty, to report accident and then directed traffic until other officers arrived); *Osinga v. Board of Trustees, PERS*, 92 *N.J.A.R.*2d (TYP) 16, 1992 *WL* 259375 (1992) (finding that school crossing guard was not injured during and as result of regular and assigned duties because, although near crossing corner, was still en route from home when she fell); *Woods v. Board of Trustees, PERS*, 92 *N.J.A.R.*2d (TYP) 160, 1992 *WL* 409327 (1992) (concluding that public works inspector hurt in car accident while driving from project site to office was injured during and as result of his regular duties); *Fulco v. Board of Trustees*, 3 *N.J.A.R.* 298 (TYP) (1981) (teacher who was injured opening windows in her classroom on very hot day twenty minutes to half hour prior to start of official school day was not injured during and as result of her duties).

## V.

Three Appellate Division opinions have also addressed the "during and as a result of the performance of his regular or assigned duties" language. Each has either implicitly or explicitly recognized the import of the amendatory language. In *Maynard, supra*, 113 *N.J.* at 171, 177, 549 *A.*2d 1213, the Appellate Division ruled that a teacher, who had signed in and was proceeding to her mailbox to obtain her students' attendance cards, was injured in a slip and fall during and as a result of the performance of her duties. We reversed on the traumatic event issue, presumably

accepting that Ms. Maynard was engaged in the performance of her duties. *Id.* at 177, 549 *A*.2d 1213.

*In re Carlson,* 174 *N.J.Super.* 603, 605, 417 *A*.2d 103 (App.Div. 1980), involved a teacher whose employment required that she arrive at the school premises not later than 8:35 a.m. The time period between arrival and the bell marking the commencement of school time was unstructured; teachers could use the time for any activities they choose. *Ibid.* However, at 8:55 a.m., teachers were required to retrieve their students from the playground. *Id.* at 606, 417 *A*.2d 103. On the day of the accident, Ms. Carlson arrived at school by 8:35 a.m., and went into the teacher's lounge to wait until 8:55 a.m. *Ibid.* When the 8:55 bell rang, Ms. Carlson fell on her back while trying to retrieve her pocketbook before leaving the teacher's lounge to meet her students. *Ibid.*

The Appellate Division ruled that Ms. Carlson sustained her injury during and as a result of the performance of her regular or assigned duties. *In re Carlson, supra,* 174 *N.J.Super.* at 608, 417 *A*.2d 103. It observed that Ms. Carlson "obviously was not expected to stand in the schoolyard door from 8:35 to 8:55." *Ibid.* Therefore, "no one can doubt that she was expected to perform this required union with her pupils by going from here to there and that necessary maneuver was as much a requirement of the job as was the actual liaison." *Ibid.* The Appellate Division, however, eschewed consideration of "the infinitely more difficult proposition respecting the obligation of teachers from the time of their mandated presence on the premises—in this case 8:35 a.m.— until the ringing of the bell signaling the commencement of the school day, such as that of supervision of early arrivals or room preparation." *Id.* at 607, 417 *A*.2d 103.

The third case, *Pollara v. Board of Trustees, PFRS,* 183 *N.J.Super.* 505, 444 *A*.2d 616 (App.Div.1982), involved a determination that Pollara, a police officer, was entitled to an accidental disability retirement allowance because of injuries sustained when he reported to work fifteen minutes prior to the roll call that began his actual shift. All officers were required by regulation to

report fifteen minutes before the shift's roll call; they received compensation for that fifteen minute pre-roll call period. *Id.* at 507–08, 444 *A.*2d 616. Failure to report could result in discipline at the discretion of the sergeant. *Ibid.* During that time period, the officers prepared themselves for duty. *Id.* at 508, 444 *A.*2d 616.

On the day of the accident, as was expected of him, Officer Pollara used the pre-shift period to don his uniform, read the bulletin board, check the teletype for recent criminal activity and scan the stolen car list. *Ibid.* When the roll-call bell rang, he proceeded up the stairwell between the locker room and the first floor roll call area. *Ibid.* As he grabbed the handrail on the stairs, it broke away from the stairs, and he fell. *Pollara, supra,* 183 *N.J.Super.* at 508, 444 *A.*2d 616. The Appellate Division found that Officer Pollara was engaged in the "actual performance" of his duties when he was injured. *Id.* at 620, 417 *A.*2d 103. According to the panel, *Carlson, supra,* had extended the scope of the "as a result of" language to encompass conduct preliminary but necessary to the actual performance of the required duty. *Id.* at 619, 417 *A.*2d 103. Likewise, the court held that

> a reasonable interpretation of the statute mandates a finding that [Officer Pollara] was hurt 'as a result of' performing a regular duty; he was required by his employment to be in the locker room before his shift began and he was required to attend roll call when the 7:45 bell rang; climbing the stairs from the locker room to the roll call area was a 'necessary maneuver' which was as much a job requirement as was actual attendance at roll call. He was paid for the 15 minutes before roll call during which he engaged in activity useful to his job efficiency. His walk to roll call was at least as necessary as Carlson's retrieval of her purse before embarking on her mandated route; indeed petitioner here was headed directly to his required destination while petitioner in Carlson was on a preliminary personal detour when she was hurt.
>
> *[Ibid.]*

Finally, *Pollara* ruled that its pre-shift period was significantly different from that in *Carlson,* where teachers were free to do as they pleased after their obligatory early arrival. *Id.* at 620, 417 *A.*2d 103. Because officers were often sent on emergencies during that pre-shift period and the police report on the accident indicat-

ed that Officer Pollara was injured "on duty," the court reasoned that the shift began at 7:30, despite the official 7:45 a.m. starting time. *Ibid.*

## VI.

Those administrative and appellate decisions share the recurring theme that, assuming all other statutory prerequisites are met, a worker will qualify for an accidental disability pension if he or she is injured on premises owned or controlled by the employer, during or as a result of the actual performance of his or her duties, or in an activity preparatory but essential to the actual duty. That is true whether the injury occurs during the workday or before or after hours.[5] In all cases, the principle that commuting injuries do not qualify is either explicitly stated or impliedly reaffirmed.

## VII.

At this point, it is necessary to define more precisely the kinds of functions that will entitle an employee to an accidental disability pension. We begin with the regular workday that we define as the period during which the employee is required to be on the employer's premises to perform regularly assigned duties.[6] Regularly assigned duties include activities such as a teacher teaching, a police officer policing, and a firefighter fighting fires. However, the concept is broader. Common sense dictates that the performance of an employee's actual duties incorporates all activities engaged in by the employee in connection with his or her

---

[5] The purpose of the 1986 amendment to *N.J.S.A.* 18A:66–39(c) was not to alter the statutory requirements for an accidental disability pension, but to make the legal ramifications of the performance of an employee's duties either before or after hours the same as if it occurred during the regular school day.

[6] Although it is not before us, that concept also covers all activities engaged in by an employee who the employer assigns to work off premises from the formal beginning to the formal end of the workday.

work, on the employer's premises, from the formal beginning to the formal end of the workday.[7]

To the extent that *Carlson* suggests that an accidental disability pension might be unavailable for an injury sustained at the work location, during the actual workday, in the period between a teacher's mandated presence on the premises and the opening bell, we disagree. The mandatory presence of the teacher on the school premises is part and parcel of his or her official duties.

That reasoning is equally applicable to *Pollara*, in which the Appellate Division painstakingly detailed claimant's every action in order to justify the awarding of an accidental disability pension. In our view, his mandated presence at the work location fifteen minutes before roll call was part of the actual performance of his duties.

## VIII.

That discussion leads us to consider activities prior to the mandatory start of the work day or after hours. Under *N.J.S.A.* 18A:66–39(c), pre- and post-workday performance of an employee's regular or assigned duties essentially constitutes a parallel universe to the performance of those duties during the regular workday. Thus, a teacher who is required to come early or stay late for parent conferences or sports practices clearly qualifies for an accidental disability pension if she receives a disabling traumatic injury while performing those duties.

Likewise, an employee who arrives early or stays late to perform activities preliminary but integral to her duties qualifies for an accidental disability pension if the other statutory standards

---

[7] Included are on-premises lunch and restroom breaks that are necessary concomitants of an employee's performance of his or her regularly assigned tasks, so long as they occur within the confines of the workday at the work location.

are met. Indeed, we view as too crabbed the conclusion reached in at least one of the cited administrative cases. To us, it is obvious that in *Fulco*, the teacher's activity of raising the windows in her oppressively hot classroom prior to the opening of school was both temporally and substantively relevant to her duties, even though the morning bell had yet not rung and she was performing that function before her presence at school was mandated.

In other words, an employee may qualify for an accidental disability pension as a result of a traumatic injury occurring prior to the start of or after the end of the formal workday, so long as the employee is at premises owned or controlled by the employer for the purpose of performing his or her regular duties and not for some other purpose. Obviously excluded are employees who arrive at work long before the required hour for a card game in the teachers' lounge, to avoid the traffic, read the paper, pay bills, or socialize, as well as employees who return to work after hours to retrieve a left-behind wallet or date book. To the contrary, the soccer coach who arrives early to bring the equipment out to the field, or who is left on the steps of the school at night after she has shepherded her last player to a waiting car, and is disabled by a traumatic injury is performing her duties, or acts essential to her duties, at the work location and thus qualifies for an accidental disability pension.

The organizing principle is that one who is at the employer's premises solely to do his or her duty, and who, while doing what he or she is expected to do, is disabled by a traumatic accident, will qualify for inclusion in the class of those injured "during and as a result of the performance of his regular or assigned duties." That interpretation is faithful to the Legislature's restorative vision in amending *N.J.S.A.* 18A:66–39(c). As we previously noted, the amendment was not transformative. It was not intended to limit the accidental disability pension solely to an injury sustained while a teacher is writing on the blackboard in her classroom or a policeman is actually engaged in an arrest. On the contrary, it was meant to restore the integrity of the premises

rule; to reinvigorate the going and coming rule; and to qualify for an accidental disability pension an employee who is on premises controlled by the employer and whose injury is causally connected, as a matter of common sense, to the work the employer has commissioned.

## IX.

That said, it is clear that both the Board and the Appellate Division diced things too finely in concluding that there were no duties for Ms. Kasper to perform until she actually entered the school building, and that she was still on her commute to work. Ms. Kasper had completed her commute when she was injured. She was at the school, at the expected time, to distribute media materials as she was required to do. She had parked her car, crossed the street to the school, and was negotiating the stairs, in an attempt to enter the building, when she was assaulted. At that moment, she was engaged in conduct that was, in every sense, preliminary but necessary to her early workday media distribution. Ms. Kasper's situation is indistinguishable from Officer Pollara's ascent of the staircase to report for duty. All other statutory requirements having been met, she qualified for an accidental disability pension for the injury resulting from the traumatic event that befell her. Contrary to our dissenting colleague's view, that outcome gives full effect to the restorative language of the accidental disability statute.

## X.

The judgment of the Appellate Division is reversed. The case is remanded to the Board for proceedings consistent with this opinion.

COLEMAN, J., concurring in the Court's judgment.

I write separately because I would use a slightly different analytical approach to reach the same ultimate conclusion as the

Court: that Kasper has satisfied the statutory requirements for an accidental disability pension.

I.

The task of construing *N.J.S.A.* 18A:66–39(c) is made easier when the statute is broken into component elements. Petitioner had to establish the following elements to be entitled to a disability pension: (1) she was under 65 years of age, (2) she is permanently and totally disabled, (3) her permanent and total disability was directly caused by a traumatic event, (4) the traumatic event occurred during the performance of her regular or assigned duties, (5) the traumatic event occurred as a result of the performance of her regular or assigned duties, (6) the traumatic event occurred at her place of employment, and (7) the traumatic event occurred at her place of employment either before, during, or after required hours of employment that are not violative of any law, valid work rule of the employer or otherwise prohibited by the employer. *Ibid.* In this case, elements numbered one, two, three, and seven are uncontested. Thus, the issues raised focus on elements four, five, and six.

The assault occurred on the steps outside the building in which Kasper performed her work. That, to me, clearly falls within her "place of employment." The Legislature chose not to limit "a place of employment" to a particular area in a building. The front steps to the building in which petitioner worked are as much a part of the physical plant comprising her place of employment as the principal's office or the media room.

This is not a "going and coming" case within the contemplation of our workers' compensation law. Kasper's commute to work under the "going and coming" rule ended when she placed one foot on the first step or a hand onto an attached handrail. *N.J.S.A.* 18A:66–39(c) is devoid of any suggestion that to be at her place of employment, petitioner had to have arrived at the part of the premises in which her duties were to be performed. The Legislature did not draw curtains around the cubicles in which

many people work, including our law clerks, to constrict their "place of employment." When a single employer occupies an entire structure, that entire structure, including the exterior and interior steps, comprise the place of employment. The administrative cases cited by the parties simply establish that an employee who is still in transit, on the street, a sidewalk or parking lot, has not arrived at his or her place of employment for purposes of pension analysis. Significantly, none of those cases involved an employee who had reached the physical structure of his or her place of employment except *Fulco v. Board of Trustees*, 3 *N.J.A.R.* 298 (1981). *Fulco* involved a teacher who was injured opening a window in her classroom twenty minutes prior to the start of the school day. I believe Fulco and the petitioner in the present case satisfied the sixth element.

## II.

The focus now shifts to the fourth and fifth elements: whether the traumatic event occurred during and as a result of the performance of petitioner's regular or assigned duties.

### A.

Although workers' compensation law, with its much broader scope, does not control the availability of accidental pensions, *Russo v. Teachers' Pension and Annuity Fund*, 62 *N.J.* 142, 146, 299 *A.*2d 697 (1973), and the same applies to tort law as evolved from the common law, in light of the similarity of issues and the lack of legislative direction on the definition of the fourth and fifth elements, our jurisprudence in those two areas can be enlightening.

The fourth element, requiring the traumatic event to have occurred during the performance of petitioner's regular or assigned duties, should be construed to refer to the time, place, and circumstances of the traumatic event. A traumatic event occurs during the performance of a work assignment if it occurs while the employee is doing what a person so employed may reasonably be

expected to be doing at the time in order to fulfill the assignment. The timing of the traumatic event must occur during the regular work day or within a reasonable time before or after the regularly or specially designated work day starts or ends. *See Coleman v. Cycle Transformer Corp.*, 105 *N.J.* 285, 288–92, 520 *A.*2d 1341 (1986).

The fifth element, requiring the traumatic event to have occurred as a result of the performance of petitioner's regular or assigned work, refers to the causal link between the traumatic event and the employment. The requirement that the traumatic event occur as a result of the performance of the petitioner's work, under tort law, means legal causation or proximate cause. Although the concept of proximate cause resists a clear definition, "we have described [it] as a standard for limiting liability for the consequences of an act based 'upon mixed considerations of logic, common sense, justice, policy and precedent.' " *Scafidi v. Seiler*, 119 *N.J.* 93, 101, 574 *A.*2d 398 (1990) (citations omitted). I am confident that the Legislature intended that the statute in question be interpreted in a manner that is consistent with logic, common sense, justice, policy, and precedent.

Under our precedents, proximate cause has been defined as "any cause which in the natural and continuous sequence, unbroken by an efficient intervening cause, produces the result complained of and without which the result would not have occurred." *Fernandez v. Baruch*, 96 *N.J.Super.* 125, 140, 232 *A.*2d 661 (App.Div.1967), *rev'd on other grounds*, 52 *N.J.* 127, 244 *A.*2d 109 (1968). When viewed in the context of the "but for" proximate cause standard, the work assignment must have been at least a contributing cause of the traumatic event when considering the totality of the circumstances surrounding the employment. Under that standard, unless it can be said that it was more probable than not that the traumatic event would have occurred under the normal circumstances of life outside of the place of employment, the necessary causal connection has been established. *See Kulas v. Public Service Elec. And Gas. Co.*, 41 *N.J.* 311, 317, 196 *A.*2d

769 (1964); Restatement (Second) of Torts § 432(1) (1965). Any enhanced risk associated with Kasper's early arrival at her school is subsumed within the proximate cause determination. When the facts in the present case are examined in the context of the foregoing legal principles and the controlling cases, petitioner is entitled to an accidental disability pension.

### B.

*In re Carlson,* 174 *N.J.Super.* 603, 605, 417 *A.*2d 103 (App.Div. 1980), raised the identical question posited here: "Do the time and place of the occurrence [of a traumatic event] mandate exclusion from statutory coverage because the event did not occur 'during and as a result of the performance of (Carlson's) regular or assigned duties?'" There, teachers were required to arrive at the school twenty minutes before the school day began, the signal for which was the ringing of the bell. The teachers were, however, free to use that twenty minutes for whatever purpose they chose.

When the bell rang, Carlson, preparing to leave the teacher's lounge to go to the playground door to meet her students, *id.* at 607, 417 *A.*2d 103, fell heavily to the floor on her back when her feet went out from under her. *Id.* at 606, 417 *A.*2d 103. The court held that "the movement of the teacher from where she is on the school premises to where she is compelled to go to meet [her students], at the time when that act is required to be done, is an injury sustained during and as a result of the performance of regular or assigned duties." *Id.* at 607–08, 417 *A.*2d 103. Thus the court in *Carlson* held that the teacher satisfied both the fourth and fifth elements of the statute, the ones primarily at issue here. The court rejected the ALJ's notion that any time prior to actually meeting with students was merely preparatory to her actual performance of her assigned work, and therefore not covered.

Two years later those same principles were applied in *Pollara v. Police & Fire Retire. Sys. Trustees,* 183 *N.J.Super.* 505, 509–10, 444 *A.*2d 616 (App.Div.1982). There, a policeman was required to report to the station house fifteen minutes before roll call. Pollara

reported as required and while walking upstairs from the locker room where he dressed, he fell when a handrail broke. The Appellate Division held that *Pollara* was controlled by *Carlson,* and concluded that the scope of the "as a result of" test extended to cover conduct preliminary and necessary to the actual performance of the required duty. *Id.* at 510, 444 *A.*2d 616.

Petitioner's injury falls squarely within the "as a result of test," as extended by *Carlson* and *Pollara.* I find no justification to conclude that it matters whether a worker is located on exterior steps about to open the door and step inside the building in which he or she works, has just stepped inside the building, is climbing interior steps, or is about to step outside to take charge of students. Under *Carlson,* whether one is injured just outside or inside the door, in my view, both should be covered. Petitioner argues, persuasively, that early arrival at work to satisfy her employer's expectations is partial performance of her duties.

*Carlson* and *Pollara* are persuasive authority supporting Kasper's claim. It can hardly be expected that petitioner would be able to have all of the required media materials distributed by the start of school at 8:45 a.m. if she did not arrive early. Indeed, her principal agreed that she should arrive early. The school did not mandate an exact time for her to arrive at the building, as was the case in *Carlson* and *Pollara.* However, it effectively created that requirement by demanding that a portion of her job duties be completed by 8:45 a.m. As a result, her mandatory work day began at such a time that would allow her to distribute the materials in a timely manner. *Cf. Pollara, supra,* 183 *N.J.Super.* at 511, 444 *A.*2d 616 (finding that the shift actually began at 7:30 despite the official 7:45 starting time). To hold otherwise would allow employers to escape disability-pension-benefit responsibilities by requiring pre- or post-workday duties without setting the precise time when the workday begins and ends.

As the court in *Pollara* so astutely reasoned, and equally applicable to this case: "Leaving aside the 'during' test, we conclude that a reasonable interpretation of the statute mandates

a finding that petitioner here was hurt 'as a result of' performing a regular duty." 183 *N.J.Super.* at 510, 444 *A.*2d 616. Further, additional language in *Pollara* is supportive of petitioner's position in this case. "[She] was required by [her] employment to be in the [school] before [her] shift began and [she] was required to [have all media materials in place] when the [8:45] bell rang; climbing the stairs [to the school door] was a 'necessary maneuver' which was as much a job requirement as was actual attendance [in school at 8:45]." *Ibid.* Also applicable to this case is the court's holding in *Pollara* that the activities performed by the officers prior to the official start of their shift, including climbing stairs, were sufficiently connected to the furtherance of their job duties to fulfill the "during" component of the statute. *Id.* at 511, 444 *A.*2d 616. *Pollara* acknowledged the legislative intent underlying the 1964 amendment to the relevant statute, *N.J.S.A.* 43:16A–7(1), to rein in "liberal application of the statute" and tighten pension eligibility, but the court noted that "the pension statute as amended must still be construed with reasonable liberality in favor of those intended to be benefitted." *Id.* at 510–11, 444 *A.*2d 616. As the Court acknowledges, all of the pension statutes are similar and the purposes behind their amendments overlap, compelling similar interpretations.

I am convinced, therefore, that the Legislature did not intend to exclude from coverage employees who are involved in "conduct preliminary but necessary to the actual performance of the required duty." *Pollara, supra,* 183 *N.J.Super.* at 510, 444 *A.*2d 616. The legislative history informs us that the 1986 amendment to the accidental disability statute was designed to broaden the category so that a member's disability would qualify him or her for accidental disability allowance if it were the result of a traumatic event that occurred during and as a result of the petitioner's regular or assigned work. *See* Assembly State Gov't. Committee Statement, Assembly Bill No. 491, February 13, 1986.

Consequently, under my slightly different approach, I, too, would reverse the judgment of the Appellate Division.

PORITZ, C.J., dissenting.

I agree with the majority's legal analysis and its conclusion that Helen Kasper's injury occurred "at a place of employment." However, I cannot accept the majority's conclusion that Ms. Kasper was injured "during and as a result of the performance of [her] regular or assigned duties." *N.J.S.A.* 18A:66–39(c). Ms. Kasper was injured as she climbed the front steps to the school. The majority holds that the injury occurred "during and as a result of the performance of [her] regular or assigned duties" because her presence on the premises was "mandated." *Ante* at 586, 754 *A*.2d at 537. In my view, Ms. Kasper was neither engaged in her teaching responsibilities, *In re Carlson,* 174 *N.J.Super.* 603, 607, 417 *A*.2d 103 (App.Div.1980) (holding that statute covers teacher injured after bell had rung and when teachers required to perform certain functions), nor taking any steps preparatory to carrying out those responsibilities, *Pollara v. Board of Trustees, PFRS,* 183 *N.J.Super.* 505, 511, 444 *A*.2d 616 (App.Div.1982) (holding that statute covers police officer injured while performing duties in preparation for beginning of shift). To find otherwise effectively writes the language, "during and as a result of the performance of . . . regular or assigned duties" out of the statute. *See Paper Mill Playhouse v. Millburn,* 95 *N.J.* 503, 521, 472 *A*.2d 517 (1984) (directing court to avoid construction of statute that renders any part of it inoperative, superfluous, or meaningless).

Accordingly, I dissent.

*For reversal and remandment*—Justices O'HERN, STEIN, COLEMAN, LONG, VERNIERO and LaVECCHIA—6.

*For affirmance*—Chief Justice PORITZ—1.