**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2494-19

DARLENE HYMAN,

     Petitioner-Appellant,

v.

BOARD OF TRUSTEES,
PUBLIC EMPLOYEES'
RETIREMENT SYSTEM,

     Respondent-Respondent.

_____

Submitted November 16, 2021 – Decided July 18, 2022

Before Judges Fisher and DeAlmeida.

On appeal from the Board of Trustees of the Public Employees' Retirement System, Department of the Treasury, PERS No. x-xx-xxx121.

Mandelbaum Salsburg, PC, attorneys for appellant (Andrew R. Bronsnick, of counsel and on the briefs).

Andrew J. Bruck, Acting Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Christopher Meyer, Deputy Attorney General, on the brief).

PER CURIAM

Petitioner Darlene Hyman appeals from the January 16, 2020 final agency decision of respondent Board of Trustees of the Public Employees' Retirement System (Board) denying her application for accidental disability retirement benefits. We reverse.

I.

Hyman was employed as a certified nurse's assistant (CNA) at the Roosevelt Care Center (RCC). A valid CNA license is a prerequisite for Hyman's position. RCC offers its staff continuing education training necessary to renew a CNA license during working hours in a classroom at the facility. Hyman obtained her continuing education training at the facility from an RCC employee before, during, and after her regular shifts. In addition, RCC offers to pay for the renewal of the CNA licenses of its employees.

RCC requires an employee, like Hyman, who elects to take advantage of the employer's offer, to come to the facility in person to pick up from the instructor a written verification of the continuing education credits she earned. In addition, the employee must come to the facility in person to pick up from a particular employee a check for the payment of the CNA license renewal fee.

A-2494-19

The written verification of training and check are available to be picked up only on Monday mornings.

Hyman worked the 11:00 p.m. to 7 a.m. shift on Mondays. She was, therefore, unable to retrieve the materials necessary to renew her CNA license during her regular working hours. On Monday, January 10, 2011, at approximately 7 a.m., sixteen hours before the start of her shift for that day, Hyman went to RCC to pick up the verification of her training and a check for the renewal of her license, which was set to expire five days later. She did not sign-in at the facility, as she customarily did when she was on duty and did not perform any of her regular work duties. Hyman was not paid for the time she spent at RCC that morning. Her only purpose in going to the employer's premises was to obtain the materials necessary for the renewal of her license.

After Hyman entered the building, she walked down a hallway toward the classroom where the instructor was issuing training verifications. She slipped and fell on a wet surface in front of a coffee shop inside the facility. Hyman injured her right knee, back, and neck in the fall.

Hyman did not seek immediate medical care. Aware that her CNA license was close to expiring, she instead finished walking to the classroom, picked up her verification, and proceeded to the office of the employee who was issuing

3

checks for the license renewal fee. She also reported to the personnel office, where she completed an incident report detailing the fall and her injuries. Hyman then drove to a nearby town and renewed her CNA license. She returned to the facility to file proof of her license renewal before leaving again. In the following months, Hyman underwent two surgical procedures to repair internal injuries to her knee.

In January 2012, Hyman filed an application with the Board for accidental disability retirement benefits, alleging she was totally and permanently disabled as a result of her fall. The Board denied Hyman accidental disability retirement benefits and instead awarded her ordinary disability retirement benefits. While the Board found Hyman was totally and permanently disabled, it determined her disability did not occur during and as a result of her regular or assigned duties.[1]

Hyman appealed the Board's decision and the matter was transferred to the Office of Administrative Law for a hearing before an Administrative Law Judge (ALJ). After a hearing, the ALJ issued a written initial decision recommending the Board grant Hyman's application. The ALJ concluded that Hyman's injuries occurred during and as a result of the performance of her

---

[1] The Board initially determined that Hyman's disability was not the direct result of the fall. It has since concluded that its initial decision on this point was incorrect.

A-2494-19

regular and assigned duties because she "was obtaining the course-credit verification, a necessary part of her licensing, on [RCC's] premises and at a time dictated by her employer . . . ." The ALJ was not persuaded by the argument that Hyman's presence at RCC was to complete a personal errand. He emphasized that the employer required her to come to the facility at a specific time when she was not on duty to retrieve the materials necessary for the renewal of her license. Alternatively, the ALJ relied on the holding in Kasper v. Bd. of Trs., Teachers' Pension & Annuity Fund, 164 N.J. 564 (2000), to conclude that Hyman's injury was eligible for accidental disability retirement benefits because it was "reasonably causally connected to her employment[,]" given that it occurred during her performance of "a required preparatory duty that was essential to her actual work . . . ." The employer filed exceptions to the ALJ's initial decision.

On January 16, 2020, the Board issued a final decision rejecting the ALJ's initial decision. The Board concluded that Hyman was not on duty when she fell or reasonably soon thereafter. In addition, the Board concluded that Hyman was not performing a required preparatory duty when she was injured, reasoning that "[j]ust because Hyman must renew her CNA license to be a CNA does not make obtaining the license part of her job duties."

Finally, the Board found that pursuant to Kasper, a preparatory duty that occurs outside the normal workday must take place when an employee is at the employer's premises "for the purpose of performing his or her regular duties and not some other purpose." See Id. at 587. Because, in the Board's view, Hyman was not at RCC to perform her regular duties, she could not have been engaging in preparatory duties when she fell. Thus, the Board concluded, Hyman was not eligible for accidental disability retirement benefits.

This appeal follows.

II.

Our review of decisions by administrative agencies is limited, with petitioners carrying a substantial burden of persuasion. In re Stallworth, 208 N.J. 182, 194 (2011). An agency's determination must be sustained "unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record." Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011) (quoting In re Herrmann, 192 N.J. 19, 27-28 (2007)). "[I]f substantial evidence supports the agency's decision, 'a court may not substitute its own judgment for the agency's even though the court might have reached a different result . . . .'" In re Carter, 191 N.J. 474, 483 (2007) (quoting Greenwood v. State Police Training Ctr., 127 N.J. 500, 513 (1992)).

While we are not bound by an agency's interpretation of legal issues, which we review de novo, Russo, 206 N.J. at 27, "[w]e must give great deference to an agency's interpretation and implementation of its rules enforcing the statutes for which it is responsible." Piatt v. Bd. of Trs., Police & Firemen's Ret. Sys., 443 N.J. Super. 80, 99 (App. Div. 2015) (quoting Saint Peter's Univ. Hosp. v. Lacy, 185 N.J. 1, 13 (2005)). "Such deference has been specifically extended to state agencies that administer pension statutes." Id. at 99.

"[A]n accidental disability retirement entitles a member to receive a higher level of benefits than those provided under an ordinary disability retirement." Patterson v. Bd. of Trs., State Police Ret. Sys., 194 N.J. 29, 43 (2008).

> [T]o obtain accidental disability benefits, a member must prove:
>
> 1.    that he is permanently and totally disabled;
>
> 2.    as a direct result of a traumatic event that is
>
>     a.    identifiable as to time and place,
>
>     b.    undesigned and unexpected, and
>
>     c.    caused by a circumstance external to the member (not the result of pre-existing disease that is aggravated or accelerated by the work);

3.     that the traumatic event occurred during and as a result of the member's regular or assigned duties;

4.     that the disability was not the result of the member's willful negligence; and

5.     that the member is mentally or physically incapacitated from performing his usual or any other duty.

[Richardson v. Bd. of Trus., Police & Firemen's Ret. Sys., 192 N.J. 189, 212-13 (2007).]

Notably,

[a] traumatic event occurring during voluntary performance of regular or assigned duties at a place of employment before or after required hours of employment which is not in violation of any valid work rule of the employer or otherwise prohibited by the employer shall be deemed as occurring during the performance of regular or assigned duties.

[N.J.S.A. 43:15A-43(a).]

The Board does not contest any of the statutory elements for the award of accidental disability retirement benefits other than whether Hyman's fall occurred during and as a result of her regular or assigned duties. The soundness of the Board's decision is determined by the holding in Kasper.

Kasper, a board of education employee, arrived in the parking lot of the school where she worked forty-five minutes prior to the start of her official shift, as she had every morning for nine months. 164 N.J. at 570. She did so because

8                                                                      A-2494-19

a supervisor required distribution of materials to classrooms prior to the official start of classes. Ibid. As she climbed the front steps of the school, a man grabbed her purse and pulled her to the ground. During the attack, she suffered injuries that rendered her totally and permanently disabled. Id. at 571. She applied for accidental disability retirement benefits. Ibid.

The pension board that considered her application determined that although she was rendered disabled by a traumatic event, she was not entitled to accidental disability retirement benefits because the attack did not occur during and as a result of the performance of her regular or assigned duties. Ibid. That board adopted an ALJ's determination that although Kasper had taken "a few steps" on her employer's property, she had not completed her commute to work when she was assaulted because she was not yet inside the school building. Id. at 572. We affirmed the board's decision. Ibid.

The Supreme Court reversed. To determine whether Kasper's injuries occurred during and as a result of her regular or assigned duties the Court examined statutes applicable to teachers' pensions that are identical to those at issue here. Id. at 574. The Legislature amended the statutes governing several pension systems at the same time to clarify the circumstances in which accidental disability retirement benefits are available. Id. at 574-76.

A-2494-19

After discussing the legislative history preceding adoption of the statutes, the Court held that

> assuming all other statutory prerequisites are met, a worker will qualify for an accidental disability pension if he or she is injured on premises owned or controlled by the employer, during or as a result of the actual performance of his or her duties, or in an activity preparatory but essential to the actual duty. That is true whether the injury occurs during the workday or before or after hours.
>
> [Id. at 585 (footnote omitted).]

The Court continued,

> it is necessary to define more precisely the kinds of functions that will entitle an employee to an accidental disability pension. We begin with the regular workday that we define as the period during which the employee is required to be on the employer's premises to perform regularly assigned duties. Regularly assigned duties include activities such as a teacher teaching, a police officer policing, and a firefighter fighting fires. However, the concept is broader. Common sense dictates that the performance of an employee's actual duties incorporates all activities engaged in by the employee in connection with his or her work, on the employer's premises, from the formal beginning to the formal end of the workday.
>
> [Id. at 585-86 (footnotes omitted).]

The Court also rejected the notion that the employee was ineligible for accidental disability retirement benefits for an accident that occurs "during the

A-2494-19

actual workday, in the period between a teacher's mandated presence on the premises and the opening bell . . . ." Id. at 586. To the contrary, "[t]he mandatory presence of the teacher on the school premises is part and parcel of his or her official duties." Ibid.

With respect to accidents that take place outside the actual workday, the Court held that "pre- and post-workday performance of an employee's regular or assigned duties essentially constitutes a parallel universe to the performance of those duties during the regular workday." Ibid.

> Thus, a teacher who is required to come early or stay late for parent conferences or sports practices clearly qualifies for an accidental disability pension if she receives a disabling traumatic injury while performing those duties.
>
> Likewise, an employee who arrives early or stays late to perform activities preliminary but integral to her duties qualifies for an accidental disability pension if the other statutory standards are met. Indeed, we view as too crabbed the conclusion reached in at least one of the [previously] cited administrative cases. To us, it is obvious that [a] teacher's activity of raising the windows in her oppressively hot classroom prior to the opening of school was both temporally and substantively relevant to her duties, even though the morning bell had yet not rung and she was performing that function before her presence at school was mandated.
>
> [Id. at 586-87.]

A-2494-19

The Court explained:

> In other words, an employee may qualify for an accidental disability pension as a result of a traumatic injury occurring prior to the start of or after the end of the formal workday, so long as the employee is at premises owned or controlled by the employer for the purpose of performing his or her regular duties and not for some other purpose. Obviously excluded are employees who arrive at work long before the required hour for a card game in the teachers' lounge, to avoid the traffic, read the paper, pay bills, or socialize, as well as employees who return to work after hours to retrieve a left-behind wallet or date book. To the contrary, the soccer coach who arrives early to bring the equipment out to the field, or who is left on the steps of the school at night after she has shepherded her last player to a waiting car, and is disabled by a traumatic injury is performing her duties, or acts essential to her duties, at the work location and thus qualifies for an accidental disability pension.
>
> [Id. at 587.]

"The organizing principle is that one who is at the employer's premises solely to do his or her duty, and who, while doing what he or she is expected to do, is disabled by a traumatic accident, will qualify for" accidental disability retirement benefits. Ibid.

The Court concluded that Kasper, as she ascended the steps at the school, was on her employer's premises at the expected time and was "engaged in conduct that was, in every sense, preliminary but necessary to her early workday

12

. . . distribution" of materials.  <u>Id.</u> at 588.  She was, therefore, entitled to accidental disability retirement benefits.  <u>Ibid.</u>

The circumstances giving rise to Hyman's fall do not fit squarely in the scenarios addressed in <u>Kasper</u>.  It is undisputed that Hyman was not assigned to perform, and did not perform, any of her regular duties on the morning that she fell.  Although she was scheduled to start her regular shift approximately sixteen hours after her fall, we cannot reasonably conclude that she arrived at RCC early for her regular duties.  Hyman concedes that she was not compensated for the time she spent at the RCC the morning of the fall and that she left her employer's premises twice – once after she obtained the materials necessary to renew her license and again after she delivered her license renewal to RCC.  We, therefore, find no fault in the Board's determination that Hyman's injuries did not occur during her regular or assigned duties or in the period immediately preceding the commencement of her duties.

We hold, however, that the Board erred in its legal conclusion that Hyman's injury did not occur during her performance of a required preparatory act essential to her actual regular duties.  A valid CNA license is mandatory for Hyman to retain her employment.  RCC provides continuing education training at the facility during the employees' regular work hours, and offers to pay the

13

license renewal fee. In order for Hyman to enjoy these benefits and ensure her continued employment, she was required by her employer to be present at RCC at a time other than her regular shift. Her sole purpose for going to RCC at the time designated by her employer was to fulfill a required preparatory duty essential to her work: to obtain the documentation and funding she needed to renew her CNA license and remain employed. These tasks were preparatory to all of the work Hyman would perform at RCC subsequent to her license renewal.

We recognize that in Kasper the Court described required preparatory acts as tasks "occurring prior to the start of or after the end of the formal workday, so long as the employee is at premises owned or controlled by the employer for the purpose of performing his or her regular duties and not for some other purpose." Kasper, 164 N.J. 587. As noted above, Hyman was not at RCC to perform her regular duties at the time she fell. In our view, however, the Board's wooden application of this passage to the unusual circumstances in which Hyman was injured undermines the intent of the Legislature when it enacted N.J.S.A. 43:15A-43(a). Hyman was at RCC at the direction of her employer solely for a purpose directly related to the performance of her regular duties as a CNA. Her presence was not in violation of any work rule. To the contrary, Hyman was at RCC to fulfill her employer's objective of having her CNA license

renewed. We conclude that her presence at RCC on the morning of her injury satisfies the statute as it was interpreted in <u>Kasper</u>, qualifying her for accidental disability retirement benefits.

We are not persuaded by the Board's argument that Hyman is not entitled to accidental disability retirement benefits because RCC's in-house training and license fee payment offer were optional. It is true that Hyman was free to find and pay for continuing education training at an off-site location and to pay the license renewal fee out of her own pocket. The record does not reveal what might motivate an employee to make those choices. RCC, however, presumably offered to provide training and to pay for the license renewals for its benefit, as well as for the benefit of its employees. RCC's involvement with the license renewal process helps to ensure that its employees' eligibility to perform their regular duties is not interrupted by periods of lapsed licensure. It is unreasonable to consider Hyman's presence at RCC on the morning she fell as the performance of a personal errand from which she alone benefitted. Her purpose was directly related to her regular duties as a CNA.

The January 16, 2020 decision is reversed. The matter is remanded to the Board for the award of accidental disability retirement benefits to Hyman. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2494-19